UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

BIMBER'S DELWOOD. INC., et al.,

                 Plaintiffs,

Vs.


Attorney General LETITIA A. JAMES, in her official capacity    **Case No. 20-CV-1043**
as the Attorney General for the State of New York, et al.,

                 Defendants.
_____


## DEFENDANTS' MEMORANDUM OF LAW
## IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION
## AND IN SUPPORT OF THEIR MOTION TO DISMISS THE COMPLAINT

LETITIA JAMES
Attorney General of the State of New York
Attorney for Defendants Attorney for Defendants
ANDREW M. CUOMO,
LETITIA JAMES,
NEW YORK STATE ASSEMBLY, and
NEW YORK STATE SENATE
By: GEORGE MICHAEL ZIMMERMANN and
JOEL J. TERRAGNOLI
Assistant Attorneys General of Counsel
Main Place Tower, Suite 300A
350 Main Street
Buffalo, NY 14202
(716) 853-8444
George.Zimmermann@ag.ny.gov
Joel.Terragnoli@ag.ny.gov

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................. 1

STATEMENT OF FACTS ................................................................................... 1

   A.  Plaintiffs' Factual Allegations .................................................................... 1

   B.  The Reasons for the Governor's Executive Orders ..................................... 5

PROCEDURAL HISTORY ................................................................................. 8

STANDARD OF REVIEW ................................................................................. 9

ARGUMENT ..................................................................................................... 10

   POINT I: PLAINTIFFS ARE NOT ENTITLED TO A PRELIMINARY INJUNCTION 10

     A.  Plaintiffs' Claims Are Not Likely to Succeed under the Deferential
     Standard of Review Applicable to Government Actions ................................. 11

     B.  Plaintiffs Have Not Shown That They Will Suffer Irreparable Injury .................. 15

     C.  The Relevant Public Interest and Equitable Considerations
     Overwhelmingly Weigh in Favor of Denying Plaintiffs' Motion ..................... 16

   POINT II: SOVEREIGN IMMUNITY BARS MANY OF PLAINTIFFS' CLAIMS ........ 17

   Point III: DEFENDANT CUOMO IS ENTITLED TO LEGISLATIVE IMMUNITY ... 20

   Point IV: EXECUTIVE LAW 29-A IS CONSTITUTIONAL ........................................... 21

   Point V: DEFENDANT CUOMO HAS NOT VIOLATED EXECUTIVE LAW 29-A .... 23

   Point VI: PLAINTIFFS HAVE NOT STATED A FIRST AMENDMENT CLAIM ....... 26

     A.  The SLA Guidance is a Temporary, Content Neutral and Incidental
     Emergency Regulation of the Plaintiffs' Speech ............................................. 27

     B.  The SLA and DOH Guidance Survives Intermediate Scrutiny .......................... 29

i

**Point VII: PLAINTIFFS HAVE NOT STATED A SUBSTANTIVE
DUE PROCESS CLAIM** ................................................................. 31

**Point VIII: PLAINTIFFS HAVE NOT STATED A PROCEDURAL
DUE PROCESS CLAIM** ................................................................. 34

**Point IX: PLAINTIFFS TAKINGS CLAUSE CLAIM MUST BE DISMISSED**............. 37

**Point X: PLAINTIFFS HAVE FAILED TO STATE A CLAIM UNDER
THE EQUAL PROTECTION CLAUSE** ............................................. 40

**Point XI: PLAINTIFFS HAVE NO CLAIM UNDER THE NINTH AMENDMENT**..... 43

**Point XII: PLAINTIFFS HAVE NO CLAIM UNDER THE TENTH AMENDMENT** .. 44

**Point XIII: THERE IS NO CAUSE OF ACTION ARISING OUT OF THE
STATE CONSTITUTION'S "TAKE CARE" CLAUSE** .................... 45

**Point XIV: PLAINTIFFS' CLAIM UNDER THE "COMPACTS CLAUSE"
MUST BE DISMISSED** .................................................................. 46

**Point XV: THE PLAINTIFF'S CLAIM FOR ATTORNEYS' FEES MUST
BE DISMISSED** ............................................................................. 49

**CONCLUSION** ....................................................................................... 49

Andrew M. Cuomo, the Governor of the State of New York ("Governor Cuomo") and Letitia James, Attorney General of the State of New York, ("AG James"), the New York Assembly, and New York Senate (together, "Defendants"), hereby move to dismiss Plaintiffs' Amended Complaint, with prejudice.

## PRELIMINARY STATEMENT

This case stands against the backdrop of the global COVID-19 pandemic that has ravaged the world at whirlwind speed. Despite this overwhelming tragedy—something even Plaintiffs admit is a "crisis" that warrants "safety protocols and restrictions" Dkt. 5 ¶¶ 46, 127—New York has begun to recover, with infection, hospitalization and death rates dropping precipitously. Guided by scientific data, New York has moved from New York Pause into NY Forward, with easing of restrictions on businesses. Businesses in Western New York, where Plaintiffs are located, are now in Phase Four. Nevertheless, Plaintiffs claim that the Defendants "have, in the name of the COVID-19 pandemic, attempted to expand their authority by unprecedented lengths, without any proper constitutional, statutory, or common law basis therefor." Id. at ¶ 3.

Plaintiffs' claims should be dismissed. Courts across the country have recognized that some individual rights must give way to a deeper need to control the spread of infectious disease and protect the lives of its citizens. Chief Justice Roberts reiterated that state officials' latitude is especially broad when they act in areas fraught with medical and scientific uncertainties. That principle should be reaffirmed here as well.

## STATEMENT OF FACTS

### A.  Plaintiffs' Factual Allegations

Solely for the purposes of the Motion to Dismiss, the Defendants accept the facts alleged in the Amended Complaint (Dkt. 5) as true, as they must. Ashcroft v. Iqbal, 129 S. Ct. 1937, 149

(2009). The Plaintiffs are various entities engaged in business in the Western New York region. Dkt. 5 ¶¶ 6-13, 53. They consist of five restaurants (two of which style themselves as "gentlemen's club[s]"), a poolhall, a bowling alley, a martial arts studio, and a provider of disc jockey and karaoke service. Id. All the Plaintiffs, save Karate Ken's and SoonerTunes, hold licenses issued by New York's State Liquor Authority ("SLA") to serve alcoholic beverages. Dkt. 5 ¶ 25. Those Plaintiffs that serve alcoholic beverages also offer live music and entertainment, including "exotic dancing" at Pharaohs and Body Shop. Id. ¶¶ 26-27. The Defendants are the Governor of the State of New York, the Attorney General of the State of New York, and both houses of the New York Legislature. Id. ¶¶ 14-17. The Governor and Attorney General are sued in their official capacities only. Id. ¶¶ 14-15.

Plaintiffs allege that they have been harmed by actions taken by Defendants in response to the COVID-19 pandemic. Id. ¶¶ 30, 31, 39. During this crisis, the Governor issued dozens of temporary Executive Orders (the "EOs"). Id. ¶¶ 34, 84. Plaintiffs allege that in doing so the Governor illegally bypassed the State Legislature. Id. ¶¶ 33-37. Plaintiffs further allege the complete or partial shutdowns required by the EO's have "devastated" their businesses. Id. ¶¶ 38, 40. While the Governor has now instituted "phase-in" periods, Plaintiffs assert the poolhall, bowling alley, and karate studio have not yet been allowed to reopen. Id. ¶ 41. Plaintiffs characterize the EOs as vague, inconsistent, and contradictory, however they have continued to attempt to come into and remain in compliance with the EOs. Id. ¶¶ 42, 46.

EO 202[1] was issued on March 7, 2020, and declared a State Disaster of Emergency for New York, "based on the **fact** that travel-related cases and community contact transmission of COVID-19 had been documented in New York State." Id. ¶ 47 (emphasis added); (see also ¶ 19

---

[1]     All of the EOs can be found at https://www.governor.ny.gov/executiveorders.

of the Declaration of Elizabeth M. Dufort, M.D., FAAP, Medical Director of the Division of Epidemiology, of the New York Department of Health ("DOH"), dated September 21, 2020 ("Dufort dec."). On March 12, EO 202.1 was issued, which cancelled or postponed any event of over 500 people for at least thirty days. Id. ¶ 48. On April 26, the Governor announced the beginning of New York Forward, reopening some sectors of industry and subsequent phases loosening restrictions by region, based on certain criteria. Id. ¶ 49. The phases were two weeks long at a minimum and allowed some businesses to reopen "under heavy restrictions". Id. ¶ 50. On June 6 and 7, EO's 202.38 and 202.39 were issued, allowing for outdoor service of food and beverages, but still prohibiting indoor dining. Id. ¶ 54. EO's 202.38 and 202.39 did not specifically prohibit live exotic dancing. Id. ¶ 55. On June 16, the Western New York region entered phase Three, allowing for restaurants and bars to re-open. Id. ¶¶ 51-52. New York issued Food Service Guidelines allowing restaurants in Phase Three regions to provide indoor dining. Id. ¶¶ 56-57. Plaintiffs were allowed to reopen under these guidelines. Id. ¶ 57.

On June 18, EO 202.43 was issued, requiring SLA-licensed businesses to supervise areas within 100 feet of their premises, to ensure that customers were abiding with Department of Health ("DOH") and SLA guidance, as well as local open container ordinances. Dkt. 5, ¶ 58. Those Plaintiffs who are licensed by the SLA complied with these requirements. Id. ¶¶ 46, 69. As of July 17, EO 202.52 required that alcoholic beverages could only be served if food was purchased, to restrict the congregation and mingling that arises in a bar service/drinking environment. Id. ¶¶ 61-62. This requirement was clarified in SLA guidance. Id. ¶ 63. The language in this guidance reflects pre-existing requirements contained in New York's Alcohol Beverage Control Law ("ABC") §§ 64 (5) and 64-a (8) that all taverns and restaurants provide food for sale to their customers.

Plaintiffs allege the EOs require taverns and bars to "reconfigure" their premises if they served only alcoholic beverages prior to the pandemic, though they were already required to provide food with alcoholic beverages under the ABC Law. Id. ¶ 64. Defendants have also directed that restaurants be limited to 50% of their occupancy. Id. ¶¶ 65, 222. Plaintiffs allege that these requirements, as well as the COVID19 pandemic itself, have had a negative effect on their businesses. Id. ¶¶ 65. Businesses, including Plaintiffs, are allowed to have live entertainment, but may not offer exotic dancing at their establishments, based on SLA guidance referred to as "Frequently Asked Questions" ("FAQs"). Id. ¶¶ 66-67, 73-74. Plaintiffs refer to this as a "targeted shut down of establishments". Id. ¶¶ 77-78. Plaintiffs allege that they have complied with the above rules and even instituted procedures and protocols which exceed those required by the State, but have been threatened by unnamed individuals with fines and closures. Id. ¶¶ 43, 46, 59, 68, 69, 150, 166, 179, 192.

Plaintiff Body Shop has not reopened due to the ban on exotic dancing, though it engages in the sale of food and alcoholic beverages. Id. ¶¶ 27, 70. Pharaohs, which also engages in the sale of food and alcohol, shut down in July of 2020, but is now open on a limited basis. Id. ¶¶ 27, 71. Pharaohs and Body Shop receive a large portion of their income through live exotic dancing. Id. ¶ 224. Despite the above, Plaintiffs allege that their businesses have been "rendered non-operational" due to the EOs and "associated guidance" and risk permanently going out of business. Id. ¶¶ 72, 80. Plaintiffs assert the cause of this financial risk is "absurd social distancing protocols" which "make operating [their businesses] virtually impossible". Id. ¶ 101.

Plaintiffs allege the Governor has instructed them to adjust to the "new normal". Id. ¶ 81. But Plaintiffs assert they are capable of handling their own self-interests, and that they could have used their own judgment to address the need for safety and health protocols. Id. ¶¶ 82-83. They

opine that the government's role is to educate and then allow the people to act in their own self-interest. Id. Plaintiffs assert the Legislature has unconstitutionally delegated its authority to the Governor pursuant to New York's Executive Law § 29-a. Id. ¶ 91. They argue that instead of issuing the EOs the Governor should have convened the Legislature and convinced it to enact whatever steps he thought necessary. Id. ¶ 92. The Amended Complaint presents a list of epidemics during which, it is alleged, the people of the State survived without the measures implemented by the EOs. Id. ¶ 96.  Plaintiffs note the national population of 331,000,000 people. Id. ¶ 101. They allege the chances of catching and dying from COVID-19 in the United States is .017%[2]. Id. ¶ 110.

Executive Law § 29-a was amended by the Legislature four days before the Governor issued the State of Emergency on March 7. Id. ¶¶ 47, 134, 138. In exercising his authority under that statute, Plaintiffs allege Governor Cuomo has not taken only those steps that are "reasonably necessary" to address the pandemic, and that he has failed to "narrowly tailor" the EOs. Id. ¶¶ 154, 159. In addition, Plaintiffs allege that "there is no evidence to suggest" that the public would not be just as safe from COVID-19 if they were to "be fully functional" and not subject to "absurd social distancing protocols". Id. ¶¶ 101, 184. Plaintiffs assert that there is no rational basis for treating their businesses differently from other businesses that are subject to less onerous restrictions by the EO's. Id. ¶ 220. Plaintiffs also complain that there is no mechanism available for them to challenge the validity of the EOs. Id. ¶¶ 180, 198.

**B.  The Reasons for the Governor's Executive Orders**

COVID-19 is a highly infectious and potentially deadly respiratory disease caused by a novel coronavirus that spreads easily from person-to-person, for which there is no existing pre-

---

[2]      Plaintiffs math is suspect, as these figures would result in just 56,270 deaths (331,000,000 x .017 = 56,270), despite the fact that the United States' death toll from COVID-19 has now topped 198,754, nearly 4 times that amount, and that number continues to grow. https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited September 21, 2020).

existing immunity. Dufort dec. ¶¶ 7-8. It can be spread by direct, indirect, or close contact with infected individuals, as well as with contaminated surfaces, and has an incubation period of up to fourteen days. Id. ¶ 12-13. Social distancing is one of the most effective means of preventing the spread of COVID19. Id. ¶¶ 13-15, 54. Since its appearance in January of this year, 198,754 people have died nationwide of COVID19. Id. ¶¶ 6, 17, 48. From the first reported case on March 1 to April 20, 2020, over 267,000 individuals in New York had tested positive for COVID-19, and over 13,000 people had died from COVID-19, which caused shortages of hospital equipment and overwhelmed hospitals and funeral homes. Id. ¶¶ 19-24. Since that time, medical professionals and scientists have begun to better understand the spread of the virus. Id. ¶¶ 103-114.  Specifically, the effect of "super-spreader events" and "super-spreaders" has become apparent. Id. ¶¶ 103, 112.  It has been found the greater the size of gatherings, the longer they last, and indoor events all encourage the spread of the virus. Id. ¶¶ 103-106, 108. This is especially so when people are in close proximity to each other and when singing or shouting takes place. Id. ¶ 106. In addition, it is now thought that 10% of infected people, the super-spreaders, are responsible for 80% of all infections. Id. ¶ 110.

In response to this crisis, Gov. Cuomo declared a State of Emergency on March 7, and began to issue the various EOs, in an effort to flatten the curve of infection. Dufort dec. ¶¶ 19, 26. This included EO 202.3, issued on March 16, which banned gatherings of more than 50 people, the closure of all indoor dining facilities, and the closure of all gambling establishments, gyms, and movie theaters. Id. ¶¶ 27, 30. It also included the direction that all non-essential businesses and employees work from home. Dufort dec. ¶¶ 27, 30, 60. On March 18 all malls and places of public amusement were closed. Id. ¶¶ 27, 30, 60. On March 22, all non-essential gathering were prohibited and individuals were directed to use social distancing and

precautionary sanitizing practices, such as using isopropyl alcohol wipes. Id. ¶¶ 30-31, 55-58. Public parks were allowed to remain open. Id. ¶ 56. These measures were developed through consultation with medical staff at the DOH. Id. ¶¶ 40, 44. The EOs also allowed certain Agencies, including the DOH and State Liquor Authority, to issue particularized guidance regarding specific industries. Id. ¶¶ 51, 88.

In late February, March, and early April, New York's COVID19 rates of infection and transmission were distressingly high. Id. ¶¶ 37, 43. However since April 9 the infection rates have declined steadily. Id. Based on those declining rates New York transitioned from New York Pause to New York Forward. Id. ¶¶ 38-39. Due to the success in battling the virus, all regions of the State are now in Phase 4. Id. ¶ 39. Happily, the rate of infection since New York Forward was implemented have remain steadily low. Id. ¶¶ 39-43, 50.

On May 21, the Governor began to relax some of the restrictions in the EOs, which was followed by further relaxations. Id. ¶¶ 33-36. Currently, gathering of up to 50 people are allowed, restaurants and bowling alleys may operate at up to 50% capacity, and museums, historical sights and related venues are open. Id. ¶¶ 36, 61, 78, 82-83. However, even these venues must follow strict guidelines to reduce viral spread. Id. ¶¶ 87-102. Low risk entertainment is also allowed, such as professional sports with no fans. Id. ¶ 63. All forms of indoor entertainment remain prohibited, with the exception of incidental music in restaurants and drive in concerts. Id. ¶¶ 64-66.  Karaoke and dancing (including exotic dancing) are specifically banned, due to the high incidence of infection they exhibit. Id. ¶¶ 67, 69-77.  Martial arts are considered a higher risk activity, but is allowed with certain restrictions. Id. ¶¶ 80-85.

As can be seen, New York has made great strides against COVID19, due to the restrictions imposed by the EOs and the responsible behavior of the vast majority of its citizens.

However, the pandemic is not over, a second wave of infections is washing over the nation, and continued restrictions must be enforced. Dufort dec. ¶¶ 45-49.

## PROCEDURAL HISTORY

The Complaint was filed on August 7, 2020. Dkt. 1. Prior to service, Plaintiffs filed the Amended Complaint, on August 27, 2020. Dkt. 5. The Amended Complaint asserts:

1. That Executive Law § 29-a is unconstitutional (based on alleged unconstitutional delegation of authority by the legislature to the Governor). Dkt. 5, ¶¶ 116-144;

2. That Defendants have violated Executive Law § 29-a (based on the allegation that enforcement actions taken by the Governor and Attorney General are in excess of their authority). Id. ¶¶ 145-162;

3. That the restriction on exotic dancing is facially unconstitutional. Id. ¶¶ 163-177;

4. That the EO's violate the due process guarantees of the 5th and 14th Amendments. Id. ¶¶ 178-195.

5. That the plaintiff's due process rights under the 5th and 14th Amendments were violated by enforcement efforts taken by the Governor and the Attorney General, which were arbitrary, capricious, irrational and abusive. Id. ¶¶ 196-200;

6. That the plaintiffs' due process rights under the 5th and 14th Amendments Takings Clause were violated. Id. ¶¶ 201-215;

7. That the plaintiffs' rights under the Equal Protection Clause of the 14th Amendment were violated. Id. ¶¶ 216-227;

8. That the Defendants' actions violate the Ninth and Tenth Amendments of the United States Constitution. Id. ¶¶ 228-234;

9. That the Governor's actions violate the "Take Care Clause" of the Constitution of the State of New York. Id. ¶¶ 235-244;

10. That the Defendants' actions violate the "Compact Clause" of the United States Constitution. Id. ¶¶ 245-249; and

11. That plaintiffs are entitled to their attorneys' fees under 42 U.S.C. § 1988. Id. ¶¶ 242-247.

8

Plaintiffs request a declaratory judgment that Executive Law § 29-a is unconstitutional on its face, that Governor Cuomo exceeded his authority under that law, and that the ban on exotic dancing is unconstitutional. Dkt. 5, Prayer for Relief ¶¶ a–b. Plaintiffs also ask for injunctive relief prohibiting the Defendants from violating the various Constitutional rights outlined in their claims[3]. Id. ¶¶ c–j. Plaintiff seek compensatory damages under their Takings Clause claim, and attorneys' fees pursuant to 42 U.S.C. § 1988.

On September 1, 2020, Plaintiffs filed their Motion for a Preliminary Hearing and Motion for an Expedited Hearing (Dkt. 6, 7). Despite the allegations in the Complaint and the two motions alleging the Plaintiffs' dire financial conditions, Plaintiffs provide no evidence of those conditions, nor any explanation as to why they waited 25 days to seek preliminary relief.

## **STANDARD OF REVIEW**

A claim should be dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) if the district court lacks the statutory or constitutional power to adjudicate it. Fed. R. Civ. P. 12(b)(1); Aliev v. U.S.P.S., 2020 WL 1956301, at 1 (W.D.N.Y. Apr. 23, 2020) (citing Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2020)). A plaintiff asserting subject matter jurisdiction has the burden of proving jurisdiction by a preponderance of the evidence. Id. To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff must allege facts that, if accepted as true, are sufficient to state a claim to relief that is plausible on its face. Id. at 2. The operative standard requires Plaintiff to provide the grounds upon which his claim rests through factual allegations sufficient to raise a right to relief above the speculative level. Id. Where, as here, dismissal is sought on both grounds, the Court should consider the Rule 12(b)(1) challenge

---

[3] Plaintiffs also ask for such relief against unnamed other applicable governmental/law enforcement authorities, but do not specify how such non-party actors could be identified or affected by such an Order.

first because the Court must have jurisdiction before it can properly determine the merits of a claim. Id. (collecting cases).

## **ARGUMENT**

### **POINT I**

### **PLAINTIFFS ARE NOT ENTITLED TO A PRELIMINARY INJUNCTION**

On a motion for a preliminary injunction, the movant must show: (i) a likelihood of success on the merits; (ii) irreparable harm in the absence of preliminary relief; (iii) that the balance of equities tips in their favor; and (iv) that an injunction is in the public interest. Winter v. NRDC, Inc., 555 U.S. 7, 20 (2008); Amato v. Elicker, 2020 U.S. Dist. LEXIS 87758, at 7 (D. Conn. May 19, 2020) (applying this standard to an application for a TRO challenging EOs issued during the COVID-19 pandemic); Geller v. De Blasio, 2020 U.S. Dist. LEXIS 87405, at 6 (S.D.N.Y. May 18, 2020) (same). The final two factors—the balance of equities and the public interest—"merge when the Government is the opposing party." L&M Bus Corp. v. Bd. of Educ. of the City Sch. Dist. N.Y., 2018 U.S. Dist. LEXIS 88354, at 44 (E.D.N.Y. May 25, 2018) (quoting Nken v. Holder, 556 U.S. 418, 435 (2009)).

"A preliminary injunction is an extraordinary remedy that should not be granted except upon a clear showing that there is a likelihood of success and irreparable injury." Diversified Mortgage Inc. v. U.S. Life Ins. Co., 544 F.2d 571, 576 (2d Cir. 1976) (emphasis added). Injunctive relief should be granted "only on the basis of showing that the alleged threats of irreparable harm are not remote or speculative but are actual and imminent." State of New York v. Nuclear Regulatory Commission, 550 F.2d 745, 755 (2d Cir. 1977). In other words, "[a] plaintiff seeking a temporary restraining order must establish that irreparable harm is likely to occur." Stagliano v. Herkimer Cent. Sch. Dist., 151 F. Supp. 3d 264, 273 (N.D.N.Y. 2015). Where the injunction sought

is mandatory, in that it would alter, not maintain, the status quo, it "should issue only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief." Cacchillo v. Insmed, Inc., 638 F.3d 401, 406 (2d Cir. 2011). Under principles of federalism and comity, "no injunction ought to issue against officers of a State clothed with authority to enforce the law in question, unless in a case reasonably free from doubt and when necessary to prevent great and irreparable injury." Massachusetts State Grange v. Benton, 272 U.S. 525, 527 (1926); accord Reynolds v. Giuliani, 506 F.3d 183, 198 (2d Cir. 2007).

Applying these standards, Plaintiffs' request for injunctive relief should be denied.

### A. Plaintiffs' Claims Are Not Likely to Succeed under the Deferential Standard of Review Applicable to Government Actions.

The power to impose public health and safety measures in response to a pandemic are among the most fundamental police powers reserved to the states by the Tenth Amendment to the United States Constitution. Jacobson v. Massachusetts, 197 U.S. 11, 25 (1905). "Upon the principle of self-defense, of paramount necessity, a community has the right to protect itself against an epidemic of disease which threatens the safety of its members." Jacobson, supra at 27. Accordingly, "when [a] state faces a major public health threat…its Tenth Amendment police and public health powers are at a maximum." Legacy Church, Inc. v. Kunkel, 2020 U.S. Dist. LEXIS 68415, at 97-98 (D.N.M. Apr. 17, 2020). "Even constitutional rights, including First Amendment rights, are subject to 'reasonable conditions' to preserve public health." Amato, supra, at 29.

The standard of review accorded to a state's exercise of its emergency police powers in response to a public health emergency is particularly deferential. The state must show only a "real or substantial relation" between the challenged action and the public health crisis. See Ass'n of Jewish Camp Operators v. Cuomo, 2020 U.S. Dist. LEXIS 117765, at 23 (N.D.N.Y. July 6, 2020)

11

(holding that the rational basis test is the appropriate standard of review of EO 202 and its continued directives barring overnight camps from opening during the summer of 2020). Indeed, in Geller v. Cuomo ("Geller II"), 2020 U.S. Dist. LEXIS 137863 (S.D.N.Y. Aug. 3, 2020), the court concluded that EO 202.45, which prohibits non-essential gatherings of over 50 people for any reason, was enacted to protect the public health and bears a real and substantial relation to the public safety concerns at issue. Id. at 3-4, 27-28. "State officials have especially broad authority when they 'undertake to act in areas fraught with medical and scientific uncertainties'." Luke's Catering Serv., LLC v. Cuomo, 2020 U.S. Dist. LEXIS 165907, at 16 (W.D.N.Y. Sept. 10, 2020) (quoting S. Bay United Pentecostal Church v. Newsom, 140 S. Ct. 1613, 1613 (2020)).

The details of the State's response to a public health emergency represent a "policy choice" within the Governor's sole discretion. Friends of Devito v. Wolf, 227 A.3d 872, 891 (Pa. 2020) (holding a policy choice made by the Governor during the COVID-19 pandemic was supported by the police power because the means chosen to meet the emergency were reasonably necessary to combat the public health crisis); see also In re Abbott, 956 F.3d 696, 717 (5th Cir. 2020) (finding the district court erred in substituting its judgment for a policy choice by the Governor during a public health crisis). Thus, judicial invalidation of reasonable emergency measures promulgated pursuant to a state's police power to respond to a global pandemic "would usurp the functions of another branch of government." Jacobson, supra at 28.

The Supreme Court's decision in S. Bay United Pentecostal Church is instructive here. There, the plaintiffs challenged an EO issued by the Governor of California that limited "attendance at places of worship to 25% of building capacity or a maximum of 100 attendees." Id. at 1. Concurring with the court's denial of the plaintiffs' application for preliminary injunctive relief, Chief Justice Roberts made clear:

12

> The precise question of when restrictions on particular social activities should be lifted during the pandemic is a dynamic and fact-intensive matter subject to reasonable disagreement. Our Constitution principally entrusts "[t]he safety and the health of the people" to the politically accountable officials of the States "to guard and protect." When those officials "undertake[] to act in areas fraught with medical and scientific uncertainties," their latitude "must be especially broad."

*Id*. at 2-3 (quoting Jacobson, supra at 38); see also Phillips v. City of New York, 775 F.3d 538, 543 (2d Cir. 2015) ("'The right to practice religion freely does not include liberty to expose the community . . . to communicable disease . . . '"). This Court also recently held that Jacobson was the appropriate standard of review for challenges to COVID-related EOs. Luke's Catering, supra.

It is anticipated that Plaintiffs will rely on the recent decision in Butler vs Wolf, 2:20-cv-00677-WSS (W.D. Pa. Sept. 14, 2020) to argue that Jacobson is outdated, has been superseded by subsequent case law, and, in any event, the length of the State Disaster or Emergency removes it from Jacobson analysis. This Court should adhere to its recent decision and reject any such argument. The age of a case is not relevant to its efficacy. Another term for an old, well-established case is binding precedent. In any event, Butler is in the minority of the Courts that have analyzed this issue. League of Indep. Fitness Fac. & Trainers, Inc. v. Whitmer, 2020 WL 3468281, at 2 (6th Cir. Jun. 24, 2020) (collecting cases); Slidewaters LLC V. Washington Dept' of Labor & Indus., 2020 WL 3130295, at 4 (E.D. Wash. Jun. 12, 2020); and Open Our Oregon v. Brown, 2020 WL 2542861, at 2 (D. Or. May 19, 2020) (gathering cases).

Butler is also factually distinguishable. To begin with, the statute in question in Butler did not allow for legislative override of the Governor's emergency actions. Id. at 19, n.12. This led the Butler Court to opine that the independent judiciary was necessary to protect the rights of the plaintiffs, in the absence of any legislative remedy. That is not the case here. Under Executive Law § 29-a (4), the "legislature may terminate by concurrent resolution executive orders issued under this section at any time." In addition, the executive actions complained of in Butler involved an

order that all Pennsylvanians stay-at-home. Butler at 2. But in New York, though businesses and public venues were closed, people were free to leave their homes and shop and exercise (outdoors). This "stay-at-home" order was a significant element in that Court's analysis of the constitutional right to interstate travel found by the Third Circuit. Id. at 48[4]. The Butler Court also faulted the Governor of Pennsylvania for taking a State wide, "one-size fits all approach" despite Pennsylvania's geographic diversity. Id. at 31. In contrast, in New York, each region had to meet specific criteria to move from one phase to another. Dkt. 5, ¶¶ 41, 49, 50, 51, 52, 57, 155. Finally, there were no medical professionals involved in drafting and implementing Pennsylvania's response to the COVID19 pandemic. Butler, at 5-6. This is not the case in New York as can be seen from the accompanying declaration of Elizbeth M. Dufort, MD, FAAP; see also Luke's Catering, supra, at 9.  Thus, Defendants maintain that Butler is wrongly decided, and, even if it were persuasive, the facts in Butler are wholly distinguishable from those of the case at bar.

As to the challenged EOs, the 50% capacity limit imposed on restaurants is an expression of the State's police power in the area of public health and safety, squarely protected by the Tenth Amendment. Jacobson, supra, at 38. Thus, the State must demonstrate only a "real or substantial" relationship between the limit and the COVID-19 pandemic. The "real or substantial relation" between the pandemic and the limit on gatherings is explained by Dr. Dufort: the greater the number of people gathered, the higher the risk of transmission of the virus. Dufort Dec. ¶¶ 69, 95, 104, 108, 110. Protection of the public from a deadly, fast-spreading disease with no vaccine or cure is a significant state interest, Amato, supra, at 28-29, and the gathering limit has a "'real and

---

[4] Of note is that in finding such a right the Butler Court cites to Williams v. Fears, 179 U.S. 270, 274 (1900), which is five years prior to Jacobson.

substantial relation' to the state's goal of curbing the spread of the virus." Id. at 30. Plaintiffs therefore are unlikely to succeed on the merits.

Plaintiffs here seek to enjoin the State from enforcing its gathering limit and other unspecified restrictions on their businesses, and in so doing invite the Court to manage the enforcement of these restrictions. Were the Court to accept Plaintiffs' invitation, it would be substituting its judgment to that of duly elected officials in matters of public health and safety, treading on law enforcement discretion, and threatening the integrity of the State's COVID-19 response, exactly what Supreme Court precedent prohibits. As the resurgence of the virus currently sweeping the nation exemplifies, the State must retain the flexibility to pull back and further limit gathering sizes or business operations if COVID-19 once again threatens to overwhelm our healthcare system. As another New York court recognized, "public officials need to have flexibility to determine how to enforce gathering restrictions." Geller II, supra, at 24.

Assuming, arguendo, the Supreme Court's decisions in South Bay and Jacobson and/or the recent holding in Luke's Catering are not controlling, Plaintiffs still fail to plausibly allege any other cause of action. See infra Parts II-XV. Thus, Plaintiffs have failed to satisfy their burden of establishing a likelihood of success on the merits, and their motion should be denied.

**B.  Plaintiffs Have Not Shown That They Will Suffer Irreparable Injury.**

A party moving for a preliminary injunction also has the burden of showing it will suffer irreparable harm if a preliminary injunction is not granted. See generally Int'l. Brotherhood of Teamsters v. Local Union No. 10, 19 F.3d 786 (2d Cir. 1994). "A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." DeVivo Assoc. v. Nationwide Mut. Ins. Co., 2020 U.S. Dist. LEXIS 94511, at 8-9 (E.D.N.Y. May 29, 2020) (citing Singas Famous Pizza Brands Corp. v. N.Y. Advert. LLC, 468 Fed. App'x 43, 45 (2d Cir. 2012)).

15

To show irreparable harm, the movant must show that an injury is not remote or speculative, but actual and imminent, and that monetary damages will not suffice as a remedy. <u>Forest City Daly Housing, Inc. v. Town of N. Hempstead</u>, 175 F.3d 144, 153 (2d Cir. 1999). The party seeking an injunction must also be able to show a relationship between the injury claimed and the conduct giving rise to the complaint. <u>Candelaria v. Baker</u>, 2006 U.S. Dist. Lexis 13238 (W.D.N.Y. 2006) (citing <u>Devose v. Herrington</u>, 42 F.3d 470, 471 (8th Cir. 1994)).

Plaintiffs fail this test. To begin with, the Amended Complaint is not verified, and the only sworn statements currently before the Court are those of counsel. Dkt. 6-1; Dkt. 7-2. Even these declarations contain no facts but only the broad statement that counsel has visited his clients' places of business and examined their financial records. <u>Id.</u> ¶ 17; Dkt. 7-2, ¶¶ 24-26. No details are provided about Plaintiffs' financial situations prior to the pandemic. No details are provided as to their current situations either, such as the number of clients and customers, the number of current employees, or any contracts for future activities. Counsel opines that he has "ascertained" that Plaintiffs will suffer irreparable harm, but he gives the Court no evidence on this point, or any reason to believe that he has any expertise in this regard. Even if these submissions were "evidence", those filings lead to the inevitable conclusion that the harm to Plaintiffs is limited to financial loss. But if Plaintiffs can be made whole by monetary damages, they have not shown irreparable harm. <u>Dexter 345 Inc. v. Cuomo</u>, 663 F.3d 59, 63 (2d Cir. 2011); <u>LSSi Data Corp. v Time Warner Cable, Inc.</u>, 892 F. Supp. 2d 489, 500-501 (S.D.N.Y. 2012).

### C. The Relevant Public Interest and Equitable Considerations Overwhelmingly Weigh in Favor of Denying Plaintiffs' Motion.

Because Plaintiffs cannot establish the likelihood of success on the merits of their claims or irreparable harm, the Court need not consider the public's interests in awarding injunctive relief or the balance of the equities. <u>Amato</u>, <u>supra</u> at 38-39. Regardless, the equities favor continuing the

16

State's aggressive response to a deadly pandemic, which was implemented only after careful and dynamic consideration of numerous safety, economic, and other issues, by agencies and experts with extensive experience in these areas. Dufort Dec. ¶¶ 1, 4, 38-54. The Supreme Court has acknowledged that courts lack the same expertise. South Bay, supra, at 3. The risk of allowing potential super-spreader events to take place across the State in the midst of the COVID-19 pandemic outweighs Plaintiffs' interest in being allowed to operate their businesses at full capacity, without any "absurd social distancing protocols." New York's success in flattening the curve may be short-lived if the State is not permitted to rationally control the easing of restrictions intended to slow the spread of COVID-19. Preliminary injunctive relief would not be in the public interest and would, in fact, run counter to the public interest in stopping the spread of the virus and protecting the public health. Because all three factors weigh against the issuance of an injunction, Plaintiffs' motion should be denied.

## POINT II

### SOVEREIGN IMMUNITY BARS MANY OF PLAINTIFFS' CLAIMS

Plaintiffs have sued the Governor and the Attorney General in their official capacities. Dkt. 5, ¶¶ 14-15. They have also sued the State Assembly and Senate. Id. ¶¶ 16-17. Plaintiffs seek compensatory damages against these Defendants for an unjust taking without compensation on their Fifth and Fourteenth Amendment claim Takings Clause claims. Dkt. 5, ¶ 215, and request declaratory and injunctive relief on their other claims. Id. at Prayer for Relief ¶¶ a-l.

But "regardless of the nature of the relief sought," suits in federal court that name states as defendants are proscribed by the Eleventh Amendment, unless Congress has abrogated that state's Eleventh Amendment immunity, or the state has waived such immunity by unambiguously consenting to the suit. Pennhurst State School & Hosp. v. Halderman, 456 U.S. 89, 100 (1984).

This immunity unquestionably extends to suits against state officials when sued in their official capacities, like the Defendants here. Mercer v. Cuomo, 2011 WL 3876310, at 8 (N.D.N.Y. 2011). It also extends to the State Legislature. "The New York State Senate and New York State Assembly constitute the legislative branch of the government of the State of New York. As such, under case law of this Court, those defendants constitute an arm of the state." Tornheim v. N.Y. State Senate, 115 Fed. App'x 482, 483 (2d Cir. 2004); see also U.L. v. New York State Assembly, 2014 U.S. Dist. LEXIS 11215, at 7-8 (S.D.N.Y. 2014) aff'd 592 Fed. App'x 40 (2d Cir. 2015)). Thus, Plaintiffs' claims seeking money damages must be dismissed.

With regard to Plaintiffs' requests for injunctive relief, a suit against a state officer in his or her official capacity seeking prospective injunctive relief to prevent a continuing violation of federal law may, in limited circumstances, be authorized under Ex Parte Young, 209 U.S. 123 (1908). But that official must have "both a particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty." Citizens Union of the State of New York v. Attorney General of the State of New York, 2017 WL 2984167, at 4 (S.D.N.Y. 2017)(emphasis added; collecting cases). As stated in Ex Parte Young, "it is plain that such officer must have some connection with the enforcement of the act, or else it is merely making him a party as a representative of the state, and thereby attempting to make the state a party." 209 U.S. at 157 (emphasis added). Numerous courts have reaffirmed this principle. See, e.g., Kelly v. New York State Civil Serv. Comm'n, 632 Fed. App'x 17, 18 (2d Cir. 2016) ("Young does not apply here. The state officer against whom prospective relief is sought 'must have some connection with the enforcement of the act' that violates federal law."); Wang v. Pataki, 164 F. Supp. 2d 406, 410 (S.D.N.Y. 2001) (same). Several courts have also applied this principle when rejecting challenges of COVID-19 related EOs. See In re Abbott, supra at 709 (sovereign immunity barred claims

against Texas Governor and AG because power to promulgate EO is not the power to enforce it); Lighthouse Fellowship Church v. Northam, 2020 WL 2614626, at 3-5 (E.D. Va. May 21, 2020) (sovereign immunity barred claims against governor because he lacked enforcement authority for COVID-19 orders he issued).

Plaintiffs have alleged that the Attorney General, not the Governor, has enforced the EOs. See, e.g., Dkt. 5, ¶¶ 30, 31, 64, 81, 83, 91, 142, 168, 188, 194, 198, 208, 209, 211, 214, etc. Plaintiffs, however, allege no specific acts of any of the Defendants in enforcing the EOs. They do allege that the statutory authority to enforce his orders is given to the Attorney General by New York's Public Health Law ("PHL") § 12. Dkt. 5, ¶¶ 150, 179, 192. But Plaintiffs ignore the fact that PHL requires a "request from the commissioner" before the Attorney General can engage in such enforcement. PHL § 12 (5). The Complaint does not allege that any such referral had been made, which is fatal in any request for injunctive relief under Ex Parte Young. Thus, the Ex Parte Young exception is inapplicable to the Defendants, and sovereign immunity bars Plaintiffs' claims for injunctive relief as against them.

The Eleventh Amendment similarly bars Plaintiffs' claims seeking relief, whether prospective or retroactive, against state officials for their alleged violations of state law, including Executive Law § 29-a. Pennhurst, supra at 117. "[I]t is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law. Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment." Id. Supplemental jurisdiction under 28 U.S.C. § 1367(a) does not constitute a congressional abrogation of the Eleventh Amendment. Nunez v. Cuomo, 2012 WL 3241260, at 20 (E.D.N.Y. 2012). Numerous Second Circuit courts have found that challenges to state law stay-at-home orders are barred by sovereign immunity. See, e.g., Elmsford Apt. Assoc.,

LLC v. Cuomo, 2020 WL 3498456, at 6 (E.D.N.Y. Jun. 29, 2020); McCarthy v. Cuomo, 2020 WL 3286530, at 6 (E.D.N.Y. Jun. 18, 2020); Yang v. Kelner, 2020 WL 2129597, at 6 (S.D.N.Y. May 5, 2020). Plaintiffs can only override this bar by showing a defendant acted "without any authority whatsoever" under state law. Sherwin-Williams Co. v. Crotty, 334 F. Supp. 2d 187, 196 (N.D.N.Y. 2004). Plaintiffs cannot do so. See infra Part V. Thus, Plaintiffs' claims for monetary damages and injunctive relief must be dismissed, as this Court lacks jurisdiction over these claims.

**Point III**

**DEFENDANT CUOMO IS ENTITLED TO LEGISLATIVE IMMUNITY**

Defendant Cuomo also has legislative immunity from Plaintiffs' claims against him in his official capacity. Legislative immunity bars claims for money damages, declaratory, and/or injunctive relief against state legislators in their official capacities. See State Emples. Bargaining Agent Coalition v. Rowland, 494 F.3d 71, 84-86 (2d Cir. 2007). Whether legislative immunity attaches depends on: (1) whether the nature of the defendant's acts giving rise to the alleged violation were "taken in the sphere of legitimate legislative activity"; and (2) whether granting the relief sought would enjoin the defendants in their legislative capacities. See id. (citing Bogan v. Scott-Harris, 523 U.S. 44, 54 (1998)).

First, Governor Cuomo's issuance of the EOs was legislative in nature. The EOs have all the traditional hallmarks of legislative action – i.e., they are directives that reflect discretionary, policymaking decisions implicating services and actions the government intended to provide and take to address an unprecedent public health crisis. State Emples., supra at 89. This point is undisputed, as several of Plaintiffs' claims are based on the premise that Governor Cuomo's issuance of the EOs was an unlawful use of legislative power. Dkt. 5, ¶¶ 116-162.

Second, granting Plaintiffs the requested relief would undoubtedly enjoin Defendant Cuomo from further acting in a legislative capacity and executing his duly-delegated authority to issue additional EOs that address the ongoing public health crisis. Plaintiffs claim it would not, stating they only seek "to invalidate the scope and breath [sic] of Defendant Cuomo's EOs" (Dkt. 5, ¶ 142), but this argument necessarily implies that Defendant Cuomo was acting unlawfully in the first place, meaning he should be not be allowed to continue issuing further emergency EOs in the future. And by seeking a declaration annulling the measure that grants Defendant Cuomo's authority to issue emergency EO's, Plaintiffs are in essence doing just that – seeking to enjoin him from carrying out delegated legislative authority. Thus, Defendant Cuomo should be entitled to legislative immunity from the Plaintiffs' claims.[5]

## Point IV

## EXECUTIVE LAW 29-A IS CONSTITUTIONAL

Plaintiffs' first claim argues Executive Law § 29-a is unconstitutional because it violates separation-of-powers principles in the State Constitution by unlawfully delegating legislative authority from the State Legislature to the Governor. Dkt. 5, ¶¶ 116-144. This claim is specifically directed "as against Defendants Cuomo, Senate and [the] Assembly." Dkt. 5, ¶ 140.

Issues of immunity aside (see supra Parts II-III), Plaintiffs' challenge to Section 29-a is also substantively meritless. Preliminarily, under New York law, "facial constitutional challenges are disfavored." Overstock.com, Inc. v. New York State Dep't of Taxation & Fin., 20 N.Y.3d 586, 593 (2013). Legislative enactments enjoy a strong presumption of constitutionality and parties challenging a duly enacted statute face the initial burden of demonstrating the statute's invalidity

---

[5]     Of course, just as this Court cannot find individual legislators liable for their legislative acts within the State Senate and Assembly, neither can it find the Assembly and/or Senate as a whole liable for their actions as a whole. Tenny v. Brandhove, 341 U.S. 367, 377 (1951).

beyond a reasonable doubt. Id. Courts must avoid interpreting a presumptively valid statute in a way that will needlessly render it unconstitutional, id., and must, instead, assume that the Legislature intended to enact a statute which was in harmony with the United States Constitution and the Constitution of the State of New York." People v. Epton, 19 N.Y.2d 496, 509 (1967). In New York, a party challenging the constitutionality of a statute "bears the heavy burden of showing that a statute is so unrelated to the achievement of any combination of legitimate purposes as to be irrational." People v. Knox, 12 N.Y.3d 60, 69 (2009).

Executive Law § 29-a unquestionably empowers the Governor to issue EOs during the pandemic to the extent "necessary to cope with the disaster." Exec. Law § 29-a (1). Under New York's Constitution, the "legislature may enact a general statute that reflects its policy choice and grants authority to an executive agency to adopt and enforce regulations that expand upon the statutory text by filling in details consistent with that enabling legislation." Matter of LeadingAge NY, Inc. v. Shah, 32 N.Y.3d 249, 259 (2018). Only when an agency promulgates a rule beyond the power it was granted by the legislature, does it usurp the legislative role and violate the separation-of-powers doctrine. Id. (citing Matter of NYC C.L.A.S.H. v. N.Y. State Office of Parks, Recreation & Historic Pres., 27 N.Y.3d 174, 178 (2016)).

That has not occurred here. A plain reading of Section 29-A shows the law was carefully tailored to alleviate separation of powers concerns. For example, any EOs issued under that section must be "reasonably necessary" to address the crisis at issue, and those EOs are only effective for a period of 30-days at a time, subject to revisit and renewal as appropriate. Plaintiffs falsely assert Section 29-A does not "authorize the Legislature to limit or revoke Defendant's authority to issue [EOs]." Dkt. 5, ¶ 129. But Section 29-A(4) clearly states, "[t]he Legislature may terminate by concurrent resolution [EOs] issued under this section at any time." Thus, to the extent the

Legislature believed the Governor was exceeding his authority, or may do so in the future, it has always retained the unqualified right to restrain his use of that authority if the need arises.

As Plaintiffs have not shown that Section 29-a is "unconstitutional beyond a reasonable doubt", their facial challenge to that law should be dismissed.

### Point V

### DEFENDANT CUOMO HAS NOT VIOLATED EXECUTIVE LAW 29-A

Initially, because the Plaintiffs' have stated no viable claims under federal law or the United State Constitution, the Court should decline to exercise supplemental jurisdiction over any State law claims. 28 U.S.C. § 1367(c). And even if the Court rejects the State's Eleventh Amendment argument regarding Plaintiffs' Executive Law 29-a claim, the Court must still find against the Plaintiffs on their second claim -- i.e., that Defendant Cuomo violated Executive Law § 29-a. Dkt. 5, ¶¶ 145-162. Without challenging any specific EO or provision thereof, Plaintiffs argue the restrictions by the EOs generally were not "reasonably necessary to aid in the disaster effort," and that "neither the uniqueness nor the severity of the COVID-19 pandemic justifies the austere measures taken by Defendant Cuomo in response thereto." Id. ¶¶ 150-151. Ignoring that sixty plus orders have continuously modified the applicable rules and restrictions for months, Plaintiffs also falsely allege "the severe, arbitrary, and unreasonable restrictions placed upon certain establishments have not been revised to reduce the strain thereof, despite the understanding of the nature of the COVID-19 in the intervening months." Id. ¶ 155.

In New York the "legislature may enact a general statute that reflects its policy choice and grants authority to an executive agency to adopt and enforce regulations that expand upon the statutory text by filling in details consistent with that enabling legislation." Matter of LeadingAge NY, Inc., supra at 259. Only when "an agency promulgates a rule beyond the power it was granted

by the legislature, it usurps the legislative role and violates the doctrine of separation of powers."
Id. (collecting cases). A court's role "in this regard is not to question the efficacy or wisdom of the
means chosen by the agency to accomplish the ends identified by the legislature. Rather, we
determine only whether the agency acted within the scope of its authority." Id. at 261. As stated
by the Court of Appeals in Citizens for Orderly Energy Policy, Inc. v. Cuomo:

> The Legislature is not required in its enactments to supply agencies with rigid
> marching orders, especially in a field as complex as nuclear power regulation,
> which is "simply incapable of statutory completion" and "where flexibility in
> the adaptation of the legislative policy to infinitely variable conditions
> constitute[s] the very essence [of the Act]" (Matter of Nicholas v. Kahn, 47
> N.Y.2d 24, 31, supra). The intricate nuances of the policy determinations
> required under the LIPA Act deserve some respect from the Court.

78 N.Y.2d 398, 410-11 (1991). Thus, the doctrine that the Legislature can invest in the Executive
Branch great flexibility to address complex and important issues remains the law of New York. In
such circumstances, the "wisdom and prudence of the Legislature's flexible approach are not ours
to question." Id. at 411; see also Broidrick v. Lindsay, 39 N.Y.2d 641, 646 (1976) (holding the
Executive Branch must be given great leeway and flexibility in determining the proper bounds of
implementing and enforcing Legislative policy).

   Applying that principle to the facts of this case, it would be challenging to identify a
circumstance where the Governor needs more flexibility than addressing the COVID-19 pandemic.
In enacting and amending Executive Law § 29-a, the State Legislature intentionally set a
framework that would provide the Governor with robust tools and broad powers to temporarily
suspend statutes and issue EOs like the ones Plaintiffs challenge here. Nearly 200,000 people in
the United States have died in the few months since the virus was identified. If ever there was a
time for the Governor to be able to issue emergency declarations and expedite the State's disaster
response it is here and now. The EOs in question are not in violation of Executive Law § 29-a, but

an implementation of the very policy the Legislature intended when it passed the statute. That policy was to give the Governor broad powers and great flexibility when dealing with an emergency, including "epidemic[s] [or] disease outbreak". Executive Law § 29-a(1). Plaintiffs have not plausibly alleged the Executive Branch is violating the policy intent of the Legislature. There is only a disagreement over the manner of its implementation.

New York courts have upheld many broad executive actions, based on wide grants of statutory authority by the Legislature. See, e.g., Boreali v Axelrod, 130 A.D.2d 107, 112 (3d Dep't 1987); Chiropractic Assn. of NY, Inc. v. Hilleboe, 12 N.Y.2d 109 (1962); Matter of NYC C.L.A.S.H., Inc., supra at 111; Matter of Allen v. NY State Dept. of Motor Vehs., 45 Misc. 3d 475, 499 (Sup Ct, Albany County 2014). The same result should be reached here. As stated by the New York Court of Appeals in Johnson v. Pataki, 91 N.Y.2d 214, 223 (1997), "we begin analysis with a recognition that when the Governor acts by Executive Order pursuant to a valid grant of discretionary authority, his actions are largely beyond judicial review." Id. at 223.

Finally, were Plaintiffs' Executive Law § 29-a claim properly brought in State court, as it should have been, it would have to have been brought pursuant to New York's Civil Practice Law and Rule's Article 78. An Article 78 proceeding is generally the proper vehicle to determine whether a statute is being properly applied by the State. See Economic Opportunity Com., Inc. v. Shaffer, 114 A.D.2d 628 (3d Dep't 1985) (citing Health Care Plan v. Bahou, 61 N.Y.2d 814, 816-817 (1984)); Bd. of Educ. v. Ambach, 49 N.Y.2d 986, 987 (1980). Under well-established Article 78 law, when the "interpretation of a statute or its application involves knowledge and understanding of underlying operational practices or entails an evaluation of factual data and inferences to be drawn therefrom, the courts regularly defer to the governmental agency charged with the responsibility for administration of the statute." Town of Lysander v. Hafner, 96 N.Y.2d

558, 565 (2001) (emphasis in original). Stated another way, the State is entitled to a "high degree of judicial deference, especially when … act[ing] in the area of its particular expertise," and, thus, a petitioner bears the "heavy burden of showing" that the executive branch's interpretation "is unreasonable and unsupported by any evidence." Matter of Nazareth Home of the Franciscan Sisters v. Novello, 7 N.Y.3d 538, 544 (2006).

Since Defendants are the entities applying Executive Law § 29-a, this Court must accept their interpretation and application of the statute unless it is unreasonable and unsupported by any evidence. The Amended Complaint does not state such a case here. At most, Plaintiffs disagree with the length of the Governor's EOs and opine they are not reasonably necessary to aid in combatting COVID-19. This amounts to a different view of the appropriateness of the Governor's actions. However, it "is not the function of judicial review in an Article 78 proceeding to weigh the facts de novo and substitute the court's judgment for that of the body reviewed, but only to determine if the action sought to be reviewed was authorized and can be supported on any reasonable basis." S.S. Silberblatt, Inc. v. Phalen, 41 Misc. 2d 899, 904 (Sup. Ct. Albany Cnty. 1964) (citing Matter of Kayfield Constr. Corp. v. Morris, 15 A.D. 2d 373, 379 (1st Dep't 1962). The Court should defer to the Governor's interpretation of Executive Law § 29-a and the actions he took to implement it, and dismiss Plaintiffs' challenge of the same here.

### Point VI

### PLAINTIFFS HAVE NOT STATED A FIRST AMENDMENT CLAIM

Plaintiffs' third claim asserts the EOs violate their rights under the First Amendment of the United States Constitution, as applied to the States through the Fourteenth Amendment. Dkt. 5, ¶¶ 163-177. Specifically, Plaintiffs assert the "SLA's guidance and FAQ which banned licensed restaurants and bars from providing exotic dancing," issued, "at the behest" of Defendant Cuomo,

are unconstitutional "content-based" restrictions on speech, which fail the "strict scrutiny" test under First Amendment case law. See id.

The First Amendment generally "forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others." Town of Del. v. Leifer, 34 N.Y.3d 234, 243 (2019) (citing Members of City Council of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 804 (1984)). The Supreme Court has held that nude dancing is a type of expressive conduct, albeit one that "falls only within the outer ambit of the First Amendment's protection" City of Erie v. Pap's AM, 529 U.S. 277, 289 (2000). Thus, Plaintiffs' decision to offer exotic dancing as entertainment is entitled to some (limited) First Amendment protection.

When the government regulates the *content* of speech, the usual presumption of constitutionality afforded to that regulation is reversed, the regulation is presumptively invalid, and, under a "strict scrutiny" standard, that measure "is enforceable only if it is the lease restrictive means for serving a compelling governmental interest." See id. (citing United States v. Playboy Entertainment Group, Inc., 529 U.S. 803, 817 (2000)). By contrast, "[a] content-neutral time, place or manner restriction [in speech], [ ] is enforceable if it satisfies a more lenient, intermediate scrutiny standard: it must be 'narrowly tailored to serve a significant government interest and leave open ample alternative channels of communication.'" Id. (citing People v. Barton, 8 N.Y.3d 70, 76 (2006)) (emphasis added). Thus, the first step in addressing Plaintiffs' First Amendment challenge is to determine which standard of review should apply.

### A.      The SLA Guidance is a Temporary, Content Neutral and Incidental Emergency Regulation of the Plaintiffs' Speech.

"To determine what level of scrutiny applies to the [regulation] at issue [ ], [the Court] must decide 'whether the State's regulation is related to the suppression of expression.'" City of Erie, 529 U.S. at 277 (citing Barnes v. Glen Theatre, Inc., 501 U.S. 560, 565-66 (1991)).

"Governmental action may restrict speech either intentionally or incidentally. Intentional restrictions are directed at the message conveyed, either its content or the time, place and manner in which it is disseminated." Islip v. Cavigilia, 73 N.Y.2d 544, 556 (1989); City of Erie, 529 U.S. at 291. By contrast, content-neutral restrictions – i.e., "those justified without reference to the content of the regulated speech and relating only to the time, place and manner of expression," will be upheld against Constitutional challenge if "the governmental interest to be achieved outweighs the resulting interference with free expression." See id. at 557.

"Intermediate scrutiny" applies if the restriction at issue "does not single out adult uses because of any hostility to the views expressed in the material they purveyed or in an attempt to insulate the public from their messages," but the measures were enacted to protect or preserve the public health, safety and welfare. Id. at 557-58; City of Erie, supra at 292-93 (holding intermediate scrutiny should apply to ordinance intended to prevent harmful secondary effects of exotic/nude dancing, and finding such measures were "not related to the suppression of expression."). In deciding whether a restriction is content-neutral, "[t]he government's purpose is the controlling consideration." Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989).

Under this framework the restrictions in the SLA Guidance are content-neutral, incidental regulations of expression. The SLA and DOH made the reasoned determination to prohibit all types of entertainment that it deemed would likely lead to the unnecessary commingling and/or congregation of persons in indoor spaces at bars and restaurants, to promote social distancing and prevent the spread of COVID-19. Dufort dec. ¶¶ 54-102. These restrictions are temporary and will only last as long as necessary to preserve the public health, safety, and welfare. Thus, the temporary prohibitions in the SLA Guidance on practically all live entertainment, including all forms of dancing, were plainly aimed at insulating the public from the harmful secondary effects that could

result from facilities engaging in activities that encouraged public gathering and commingling during this pandemic.

There is no evidence the SLA Guidance was <u>intended</u> to restrict the Plaintiffs' expressive speech. While the SLA Guidance identified exotic dancing as a type of entertainment that is not yet permitted, all other forms of dancing are also prohibited, as were other types of entertainment, except music, and only with certain health-conscious restrictions in place. Similarly, under other EOs currently in place (EO 202.5, 202.48, 202.60, etc.), entertainment venues that offer dancing in any form (Broadway, theatre, etc.), all remain closed. Again, the decision to prohibit most forms of live entertainment was because of the crowds and commingling of persons that those activities attract and generate. These restrictions have nothing to do with the content of Plaintiffs' speech. Plaintiffs are as much precluded from offering exotic dancing at their establishments as they are from performing their own rendition of Cats!, showcasing a neoclassical ballet troupe, or hosting a country music square dancing class. <u>City of Erie</u>, <u>supra</u> at 291. Thus, if a First Amendment analysis is even appropriate here in light of <u>Jacobson</u>, <u>supra</u>, intermediate scrutiny is the appropriate standard of review.

### B.      The SLA and DOH Guidance Survives Intermediate Scrutiny.

"A content-neutral regulation will be sustained under the First Amendment if it advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests." <u>Turner Broad. Sys. v. FCC</u>, 520 U.S. 80, 189 (1997); <u>Renton v. Playtime Theatres</u>, 475 U.S. 41, 47 (1986) (same). Although a content-neutral regulation should be "narrowly tailored" to serve the government interest, "it need not be the least restrictive or least intrusive means of doing so," and the tailoring requirement is satisfied "so long as the regulation promotes a substantial governmental interest that would be

achieved less effectively absent the regulation." Hobbs v. Cnty. of Westchester, 397 F.3d 133, 149 (2d Cir. 2005) (citing Ward, 491 U.S. at 791, 799). Several New York courts have rejected challenges to restrictions on speech imposed by EOs because of COVID-19. See, e.g., McCarthy v. Cuomo, 2020 U.S. Dist. LEXIS 107195, at 11-12 (E.D.N.Y. June 18, 2020) (rejecting First Amendment challenge to EOs prohibiting gatherings by owner of gentlemen's club under intermediate scrutiny review, holding, in part, "I can think of few governmental interests more pressing than protecting the public from transmission of highly-contagious and often deadly disease. The available scientific and medical evidence strongly supports restrictions on gatherings as a means of containing the virus."); Geller v. De Blasio, supra at 10-13 (S.D.N.Y. May 18, 2020) (applying intermediate scrutiny to First Amendment challenge over gathering restrictions).

This Court should do the same. The government's interest in this case – protecting the public from transmission of a highly-contagious and deadly disease – is significant. The goal of achieving that interest would be achieved less effectively without the rules put into place by agencies like DOH and SLA, which require social distancing and prevent establishments from hosting those activities that lead to the unnecessary commingling and gathering of persons and crowds indoors. The harm that would result if the COVID-19 virus were to spread because such measures as were not imposed would be irreversible. One cannot simply "walk back" an infection or achieve retroactive relief from a growing infection rate through judicial review.

The restrictions created by the SLA Guidance are temporary and will only be in place so long as there is still a public health emergency that requires the implementation of social distancing and other preventative measures. Dufort dec. ¶¶ 37-53; see also the EOs generally. To the extent Plaintiffs wish to exercise their First Amendment rights to communicate the "message" of exotic dancing, they retain other reasonably accessible alternative means of doing so, such as through

print/visual media, video recording, and/or over the internet. The restrictions created by the SLA and DOH Guidance were only issued after careful consideration of the likely public health effects of SLA-licensed businesses offering those forms of entertainment that were ultimately prohibited – namely, the likelihood that such entertainment would result in the unnecessary commingling and congregation of people, in places where alcohol is served, reducing the likelihood that social distancing measures would be followed, and increasing the likelihood of COVID-19 transmission. Dufort dec. ¶¶ 64-77, 87-102. Thus, the SLA Guidance survives intermediate scrutiny review, and the Plaintiffs' First Amendment claim should be dismissed.

**Point VII**

**PLAINTIFFS HAVE NOT STATED
A SUBSTANTIVE DUE PROCESS CLAIM**

Plaintiffs' fourth claim asserts that "even assuming, *arguendo*, that there exists a legitimate State interest in protecting the public's health and welfare," Defendants' actions in issuing and/or enforcing the EOs arbitrarily and unreasonably interfered with the Plaintiffs' property interests, in violation of their substantive due process rights under the Fifth and Fourteenth Amendments. Dkt. 5, ¶¶ 178-195. Plaintiffs further argue the EOs are "overbroad and vague," and "lend themselves to arbitrary enforcement with massive repercussions," though they do not identify which EOs they are challenging under this these theories. Id.

Plaintiffs cannot sustain a Fifth Amendment substantive Due Process Clause claim because that Amendment is only applicable to the federal government. See, e.g. Solomon v. City of Rochester, 2020 WL 1493957, at 6 (W.D.N.Y. Mar. 27, 2020). Indeed, "[a]ny due process rights plaintiff enjoys as against state government officials ... arise solely from the Fourteenth Amendment due process clause." Seidman, 2019 U.S. Dist. LEXIS 35684, at 4 (N.D.N.Y. 2019)

(citing Maddox v. Fowler, 2015 WL 4366222 at 10 (N.D.N.Y. 2015)). Plaintiffs have sued only State actors in this case, and therefore do not have a claim under the Fifth Amendment.

With respect to Plaintiffs' Fourteenth Amendment substantive due process claim, such a claim will be dismissed as superfluous where another constitutional provision provides an explicit textual source of protection and the Plaintiffs have already sought relief under it. United States v. Lanier, 520 U.S. 259, 272 n.7 (1997) ("If a constitutional claim is covered by a specific constitutional provision [ ] the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process."); Cty. of Sacramento v. Lewis, 523 U.S. 833, 842–43 (1998) (same). Here, Plaintiffs invoke and seek relief under many other specific constitutional provisions. Dkt. 5. Thus, Plaintiffs' substantive due process claim is duplicative of those claims and must be dismissed. Lanier, supra at 272 n.7.

Second, Plaintiffs assert they have a right to pursue an economic livelihood and operate their businesses as they deem appropriate, despite the ongoing pandemic. Dkt. 5, ¶¶ 192-193. Plaintiffs do not claim (and cannot claim) infringement of a "fundamental right" protected by the United States Constitution. The scope of rights afforded by the substantive component of the due process clause is extremely limited. Indeed, substantive due process protection extends only to those interests that are "implicit in the concept of ordered liberty," rights "so rooted in the traditions and conscience of our people as to be ranked as fundamental." Walker v. City of Waterbury, 361 Fed. App'x 163, 165 (2d Cir. 2010). "The protections of substantive due process have for the most part been accorded to matters relating to marriage, family, procreation, and the right to bodily integrity." Albright v. Oliver, 510 U.S. 266, 271-272 (1994).

Interests related to employment are generally not considered fundamental rights subject to substantive due process protection. Walker, supra at 165. For due process purposes, "[b]usiness in

the sense of the activity of doing business, or the activity of making a profit is not property in the ordinary sense.'" <u>Nat'l Rifle Ass'n of Am. v. Cuomo</u>, 350 F. Supp. 3d 94, 136 (N.D.N.Y. 2018) (citing <u>Chrebet v. Cty. of Nassau</u>, 24 F.Supp.3d 236, 245 (E.D.N.Y. 2014); <u>see also</u> <u>College Savings Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.</u>, 527 U.S. 666, 675 (1999)). Since the interests at issue here relate to Plaintiffs' ability to pursue an economic livelihood, they have not demonstrated infringement of a fundamental right protected by the substantive due process clause, further undermining that claim.

Third, even assuming, <u>arguendo</u>, that Defendants had deprived Plaintiffs of a fundamental right, the Amended Complaint does not plausibly allege the type of extreme conduct necessary to implicate substantive due process. To plausibly allege a substantive due process claim, "plaintiffs must show egregious, outrageous government conduct injurious to an interest implicit in the concept of ordered liberty." <u>Autotech Collision, Inc. v. The Inc. Vill. of Rockville Center</u>, 673 Fed. App'x 71, 73 (2d Cir. 2016). Conduct that is merely "incorrect or ill-advised" does not meet this high standard. <u>Id.</u> (citing <u>Lowrance v. Achtyl</u>, 20 F.3d 529, 537 (2d Cir. 1994)). Instead, it protects only against "egregious conduct which…can fairly be viewed as so brutal and offensive to human dignity as to shock the conscience." <u>Smith v. Half Hollow Hills Cent. Sch. Dist.</u>, 298 F.3d 168, 173 (2d Cir. 2002). Indeed, the Supreme Court has "been reluctant to expand the concept of substantive due process because guideposts for responsible decision making in this unchartered area are scarce and open-ended." <u>DeStefano v. Inc. Vill. of Mineola; the Bd. of Trustees of the Inc. Vill. of Mineola</u>, 2018 WL 4100495, at 9 (E.D.N.Y. 2018) (citing <u>Collins v. City of Harker Heights</u>, 503 U.S. 115, 125 (1992)). The Amended Complaint does not plausibly allege that the applicable EOs "shock the conscience," as required under the authority cited above. Nor can it be reasonably argued that the Governor's issuance of EOs pursuant to valid statutory authority, to

slow the spread of a fatal virus, represents the extreme level of governmental abuse of power required to sustain a substantive due process claim.

This is particularly true given the Supreme Court's decision in Jacobson. In unprecedented times like these, judicial scrutiny is reserved only for a measure that "has no real or substantial relation to" the objective of protecting "the public health, the public morals, or the public safety," or is "beyond all question, a plain, palpable invasion of rights secured by the fundamental law." Geller v. DeBlasio, 2020 WL 2520711, at 4 (S.D.N.Y. May 18, 2020) (citing Jacobson, 197 U.S. at 31); see also Luke's Catering, supra. Reasonable minds may differ over the right response to a global pandemic, but a difference in opinion is not a substantive due process violation.

### Point VIII

### PLAINTIFFS HAVE NOT STATED A
### PROCEDURAL DUE PROCESS CLAIM

Plaintiff's fifth claim asserts that "Defendant Cuomo's [EOs], as [ ] enforced by Defendant James," "unlawfully interfere[ ] with Plaintiffs' protected liberty and property interests," leaving them "no substantial means" other than litigation to challenge those actions, in violation of their Fifth and Fourteenth Amendment rights. Dkt. 5, ¶¶ 196-200. Plaintiffs cannot sustain a Fifth Amendment procedural due process clause claim as that Amendment is only applicable to the federal government, not state actors like the Defendants. Solomon, supra, at 6.

The Complaint does not plausibly allege a Fourteenth Amendment procedural due process claim either for three reasons. First, the initial inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in "property" or "liberty." Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 59 (1999); Mathews v. Eldridge, 424 U.S. 319, 332 (1976). Only then do we look to see if a state's procedures comport with due process. Id. at 332. Plaintiffs have not alleged any facts from which it could be plausibly inferred that they have a protected property

interest or liberty interest affected by the EOs at issue. "Doing business" is not a protected property right for procedural due process purposes. See, e.g., Murtaugh v. New York, 810 F. Supp. 2d 446 (N.D.N.Y. 2011) (citing College Savs. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666, 675 (1999)); Xponential Fitness, 2020 U.S. Dist. LEXIS 123379, at 16 (D Ariz July 14, 2020). Where, as here, Plaintiffs allege only an impact on their business operations, they have no procedural due process claim. NRA of Am. v. Cuomo, 350 F Supp 3d 94, 136 (NDNY 2018); Chrebet v. Cnty. of Nassau, 24 F. Supp. 3d 236, 246 (E.D.N.Y. 2014).

Second, Plaintiffs' procedural due process claim fails because the EOs are legislative in nature, rather than adjudicative, and therefore they are not subject to the procedural due process claimed in the Complaint. "Official action that is legislative in nature is not subject to the notice and hearing requirements of the due process clause." Murphy v. Lamont, 2020 WL 4435167, at 11 (D. Conn. Aug. 3, 2020) (citing Logan v. Zimmerman Brush Co., 455 U.S. 422, 433 (1982)); see also N.Y. Pet Welfare Ass'n, Inc. v. City of N.Y., 143 F. Supp. 3d 50, 70 (E.D.N.Y. 2015) (quoting Interport Pilots Agency, Inc. v. Sammis, 14 F.3d 133, 142 (2d Cir. 1994)).

Executive Law § 29-a was passed by the elected members of the New York State Legislature and fully reflects the police powers of the State as laid out in Jacobson, while imposing reasonable limits on the Governor. The statute limits the Governor's emergency authority in scope and time, and authorizes the Legislature to terminate those actions "at any time," preserving the separation of powers. Exec. Law § 29-a. The doctrine is well-established: "Government makes so many policy decisions affecting so many people that it would likely grind to a halt were policymaking constrained by constitutional requirements on whose voices must be heard." N.Y. Pet Welfare Ass'n, supra at 70 (quoting Minn. State Bd. for Cmty. Colls. v. Knight, 465 U.S. 271, 284-85 (1984)). This doctrine applies equally to executive branch officials and agencies when

performing essentially legislative functions. See Interport Pilots, supra at 143 (holding that actions by New York State agency were "legislative rather than adjudicative in nature").

The EOs at issue here are legislative in nature. "Official action is adjudicative when it is 'designed to adjudicate disputed facts in particular cases.' It is legislative when it has 'general application and look[s] to the future.'" O'Bradovich v. Vill. of Tuckahoe, 325 F. Supp. 2d 413, 429-30 (S.D.N.Y. 2004) (quoting Florida E. Coast Ry., 410 U.S. at 245). The EOs are generally applicable – covering all New York State businesses and all New Yorkers – and lay out rules that apply prospectively statewide, rendering them legislative. Thus, Plaintiffs cannot challenge the EOs on procedural due process grounds.

Third, even if the Court finds the procedural due process clause applies to the EOs, there is no violation of the due process clause so long as the State provides a meaningful post-deprivation remedy. See Hellenic Am. Neighborhood Action Comm. v. City of New York, 101 F.3d 877, 880 (2d Cir. 1996). Where, as here, a plaintiff claims a state official deprived him of a property or liberty right based upon a random, arbitrary, or unauthorized act, he has an adequate post-deprivation remedy in the form of a CPLR Article 78 proceeding, where the alleged arbitrariness of the EOs could be challenged. Id. at 881 (holding that an Article 78 proceeding "is a perfectly adequate post deprivation remedy"); see, e.g., Ahmed v. Town of Oyster Bay, 7 F. Supp. 3d 245, 254 (E.D.N.Y. 2014)) (citing Grillo v. N.Y.C. Transit Auth., 291 F.3d 231, 234 (2d Cir.2002)); Johnson v. Pataki, 91 N.Y.2d 214 (1997). The availability of such relief here dooms Plaintiffs' procedural due process claim.

**Point IX**

**PLAINTIFFS TAKINGS CLAUSE CLAIM MUST BE DISMISSED**

Plaintiffs' sixth claim asserts a claim under the "Takings Clause" of the Fifth and Fourteenth Amendments. Dkt. 5, ¶¶ 201-215. Specifically, Plaintiffs assert the EOs have forced them "to sacrifice all, or nearly all, beneficial use of their property in the name of public health", without just compensation, in violation of the Takings Clause. Id. ¶ 206.[6]

Plaintiffs' Taking Clause claim is substantively meritless. There are two types of regulatory takings: categorical and non-categorical. Sherman v. Town of Chester, 752 F.3d 554, 565 (2d Cir. 2014). "A categorical taking occurs in 'the extraordinary circumstances when *no* productive or economically beneficial use of land is permitted.'" Id. (emphasis in original) (citing Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency, 535 U.S. 302, 330 (2002)). "Anything less than a complete elimination of value, or a total loss, is a non-categorical taking, which is analyzed under the framework created in Penn Central Transportation Co. v. New York City, 438 U.S. 104 (1978)." Id. "A plaintiff seeking to show a regulatory taking has a heavy burden." Nat'l Fuel Gas Distrib. Corp. v. NYSERDA, 265 F. Supp. 3d 286, 293 (W.D.N.Y. 2017).

Since Plaintiffs allege the Defendants' have required them to sacrifice "nearly all" beneficial use of their property, they have not alleged a categorical taking. Plaintiffs have all been allowed to open to some extent and resume their business activities, at reduced capacity, except Bison Billiards, which can still serve food and beverages, but cannot rent out its pool tables. Dkt. 5, ¶¶ 25, 44, 65, 222; Duford dec. ¶ 86-102, 114. Thus, Plaintiffs have alleged a non-categorical

---

[6]       The merits of this claim aside, Plaintiffs incorrectly allege they could be subject to "criminal penalties" for violations of the EOs. Id. ¶ 206. The Amended Complaint itself correctly points out that the EOs are enforceable through New York's PHL § 12. Dkt. 5, ¶ 150. But even a summary review of that statute reveals that it allows for civil, not criminal, enforcement of New York's public health laws. Thus, Plaintiffs have not plausibly alleged that they are (even potentially) subject to criminal penalties.

taking that should be analyzed under the <u>Penn Central</u> framework. <u>Sherman</u>, 752 F.3d at 565; <u>Leb. Val. Auto Racing Corp. v Cuomo</u>, 2020 U.S. Dist. LEXIS 143223, at 19 (N.D.N.Y. Aug. 11, 2020).

Under the <u>Penn Central</u> rubric, the Amended Complaint has not stated a Takings Clause claim.  "It is well settled that a 'taking' does not occur merely because a property owner is prevented from making the most financially beneficial use of a property."[7] <u>Kabrovski</u>, 149 F. Supp. 3d at 424-25. Instead:

> "In engaging in these essentially ad hoc, factual inquiries, the Court's decisions have identified several factors that have particular significance. The economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations are, of course, relevant considerations. So, too, is the character of the governmental action. A "taking" may more readily be found when the interference with property can be characterized as a physical invasion by government, than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good."

<u>Penn Cent. Transp. Co. v New York City</u>, 438 U.S. 104, 124 (1978).

Plaintiffs' Takings claim fails under this framework. Plaintiffs do not provide any basis for the Court to determine the extent of the economic impact of the EOs on their businesses.  There is simply the allegation that they are unable to operate most of their business, an allegation which is belied by the fact that most of the Plaintiffs are being allowed to operate at 50% of revenue. A loss of 50% is not "most" of 100%. This lack of specificity does not allow the Court to evaluate the economic impact of the EOs on Plaintiffs' businesses, as required by <u>Penn Central</u>. <u>Auracle Homes</u>, 2020 U.S. Dist. LEXIS 141500, at 39 (D. Conn. Aug. 7, 2020) ("Plaintiffs have not quantified the precise economic impact that the eviction moratorium and security deposit

---

[7]     "It seems to us that the property owner necessarily expects the uses of his property to be restricted, from time to time, by various measures newly enacted by the State in legitimate exercises of its police powers." <u>Lucas v. S.C. Coastal Council</u>, 505 U.S. 1003, 1027 (1992).

provisions have had on their property"). The Amended Complaint also does not describe how the EOs have interfered with their distinct investment-backed expectations. However, all but two of the Plaintiffs have liquor licenses, meaning they are already subject to extensive regulation under the ABC and can have been expected to anticipate further regulation in the future. Their investment-backed expectations must be seen as relatively modest. "One who chooses to engage in a publicly regulated business, such as the taxicab business, by so doing surrenders his right to unfettered discretion as to how to conduct same." Alexandre v NY City Taxi & Limousine Commn., 2007 U.S. Dist. LEXIS 73642, at 27 (S.D.N.Y. 2007). In addition, the character of the EOs challenged here—i.e., an emergency response to a global pandemic that resulted in temporary economic restrictions being placed on Plaintiffs' property for the protection of the common good— further undermines their claim that a taking has occurred. Connolly v. Pension Benefit Guar. Corp., 475 U.S. 211, 225 (1986) ("This interference with the property rights of an employer arises from a public program that adjusts the benefits and burdens of economic life to promote the common good and, under our cases, does not constitute a taking requiring Government compensation.").

In a recent case raising a similar Fifth Amendment challenge to numerous COVID-19 related EOs, the Pennsylvania Supreme Court held that the movants had failed to state a regulatory taking claim, finding the temporary impact on their business, and the Pennsylvania Governor's reasoning for imposing the restrictions at issue on those properties, "namely, to protect the lives and health of millions of Pennsylvania citizens, [was] undoubtedly [ ] a classic example of the use of the police power to protect the lives, health, morals, comfort and general welfare of the people," and was not a regulatory taking. Friends of Danny DeVito, supra at 896 (citing Manigault v. Springs, 199 U.S. 473, 480 (1905)). The same result should be reached here.

39

Finally, a Takings Clause claim ordinarily will not be subject to injunctive relief since "takings claims typically involve property interests for which the government can provide monetary compensation without the government being deprived of the property or public benefit that it seeks". Auracle Homes, supra, at 35 (quoting Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot., 560 U.S. 702, 740-741 (2010)). "It makes perfect sense that the remedy for a Takings Clause violation is only damages, as the Clause does not proscribe the taking of property; it proscribes taking without just compensation." Id. Since the Defendants that the Plaintiffs have chosen to sue are immune from a suit for money damages, a Takings Clause claim against them has to fail for this reason as well.

**Point X**

**PLAINTIFFS HAVE FAILED TO STATE A CLAIM**
**UNDER THE EQUAL PROTECTION CLAUSE**

Plaintiffs' seventh claim alleges the EOs violate the Equal Protection clause. Dkt. 5, ¶¶ 216-227. "The equal protection clause directs state actors to treat similarly situated people alike." Giano v. Senkowski, 54 F.3d 1050, 1057 (2d Cir. 1995). "To prove an equal protection violation, claimants must prove purposeful discrimination, directed at an identifiable or suspect class." Id. But "a plaintiff who does not allege membership in a protected class may, nonetheless, bring a 'class of one' equal protection claim." Kabrovski, supra, at 422-23. "Plaintiffs, as commercial business owners, do not belong to a suspect or quasi-suspect class. Moreover, the regulation of business operations does not impinge on fundamental rights." Talleywhacker, Inc. v. Cooper, 2020 WL 3051207, at 8-9 (E.D.N.C. Jun. 8, 2020). Therefore, Plaintiffs are asserting a class of one equal protection claim.

To state a "class of one" discrimination claim sufficient to survive a motion to dismiss, "the plaintiff must plausibly allege that he or she has been intentionally treated differently from

40

others similarly situated and no rational basis exists for that different treatment." Progressive Credit Union v. City of New York, 889 F.3d 40, 49 (2d Cir. 2018) (citing Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000)). Plaintiffs must also identify at least one other similarly situated party that was treated more favorably. Kabrovski, supra, at 423; Panzella v. City of Newburgh, 231 F. Supp. 3d 1, 8 (S.D.N.Y. 2017) (collecting cases). "General allegations that would previously have overcome a motion to dismiss on a 'class of one' equal protection claim are no longer sufficient." Kenmore Mercy Hosp. v. Daines, 2011 WL 4368564, at 16, 18 (W.D.N.Y. Sept. 18, 2011).

A class-of-one plaintiff "must show an extremely high degree of similarity between themselves and the persons [with] whom they compare themselves." Clubside v. Valentin, 468 F.3d 144, 159 (2d Cir. 2006). A plaintiff is not required to prove "a defendant's subjective ill-will towards a plaintiff" and can prevail on a class-of-one claim based on similarity alone. Hu v. City of New York, 927 F.3d 81, 93 (2d Cir. 2019). But to prevail on similarity alone, a plaintiff must prove that: "'(i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendant acted on the basis of a mistake.'" Hu, supra, at 94 (quoting Neilson v. D'Angelis, 409 F.3d 100, 104-05 (2d Cir. 2005)).

Plaintiffs herein assert that Defendants' enforcement of the EOs has subjected them to disparate treatment "as compared to identically situated businesses throughout the State of New York" for which "there is no rational basis". Dkt. 5, ¶ 220. Yet the Amended Complaint does not identify any similarly situated businesses entities that were treated differently than Plaintiffs were. It does allege that bars and restaurants are required to operate at 50% capacity while other entities

are not. Dkt. 5, ¶¶ 222-223. But two of the Plaintiffs are not subject to the 50% capacity limit, while the remainder (restaurants and taverns) are. Plaintiffs also allege that the two "gentlemen's clubs" are subject to restrictions on exotic dancing while the other, unidentified "identically situated businesses" are not, Dkt. 5, ¶ 225, but no supporting details were provided. Such vague allegations do not meet the need for specificity required for a class of one claim.

In addition, all restaurants and bars in Phase Four regions in New York are subject to the 50% restriction. All "gentlemen's clubs" are subject to the ban on all dancing, including exotic dancing, as are all public venues, whether serving alcohol or not. Dufort dec. ¶¶ 69-77. All poolhalls are closed and all martial arts studios are subject to the same restriction as the Plaintiffs who operate those types of businesses. Dufort dec. ¶¶ 85-86, 114. The failure of the Plaintiffs to identify similarly situated parties that are treated more favorably than the Plaintiffs is fatal to their claims and warrant its dismissal. Kabrovski, supra, at 423; Kenmore Mercy, supra, at 16, 18.

An equal protection claim must also plausibly allege there was no rational basis for the difference in treatment received. A classification "must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for classification." Heller v. Doe, 509 U.S. 312, 320 (1993). Plaintiffs' equal protection claim does not survive this analysis. As Dr. Dufort explains, the restrictions on the Plaintiffs' various businesses are rationally related to the pressing need to restrict the spread of the virus which causes COVID19. Dufort dec. ¶¶ 38-53, 55. 103-114. The EOs were issued as an emergency response to protect the public's health and welfare, and thus plainly served a legitimate governmental purpose. Thus, even if Plaintiffs have been treated differently than other similarly situated businesses, Plaintiffs have still not plausibly alleged an equal protection claim because the Amended Complaint states that treatment was based on mistake and not purposeful action.

Lastly, even if Plaintiffs were subjected to differential treatment by the enforcement of the EOs, Federal courts have rejected similar challenges to COVID-related EOs, finding the nature of the pandemic permitted differential treatment of businesses within a single industry, and/or between different types of businesses open to the public. See, e.g., Talleywhacker, supra, at 9; Six v. Newsom, 2020 WL 2896543, at 7 (C.D. Cal. May 22, 2020). The same result obtains here.

**Point XI**

**PLAINTIFFS HAVE NO CLAIM UNDER THE NINTH AMENDMENT**

The Complaint's eighth claim purports to be brought for violations under the Ninth and Tenth Amendments to the Constitution. Dkt. 5 ¶¶ 228-234. But the Plaintiffs' Ninth Amendment challenge to the Defendants' actions is simply untenable. Neither of these amendments create individual rights. The Ninth Amendment is a restriction on the powers of the Federal government, not the States or State officials, such as the Defendants. United Pub. Workers v Mitchell, 330 U.S. 75, 96 (1947) ("Therefore, when objection is made that the exercise of a federal power infringes upon rights reserved by the Ninth and Tenth Amendments, the inquiry must be directed toward the granted power under which the action of **the Union** was taken") (emphasis added); Jenkins v. Commissioner, 483 F3d 90, 93-94 (2d Cir 2007). Nor does the Ninth Amendment provide "an independent source of individual rights; rather, it provides a rule of construction that we apply in certain cases." Barnett v. Carberry, 420 Fed. Appx. 67, 69 (2d Cir. 2011). Thus, the Ninth Amendment "does not provide any individual rights that can support a suit under Section 1983." Melendez v. City of NY, 2017 U.S. Dist. LEXIS 154424, at 18 (S.D.N.Y. 2017) (citing cases); Tuff v. Vil. of Yorkville Police Dept., 2017 U.S. Dist. LEXIS 12142, at 18 (N.D.N.Y. 2017). When the Amended Complaint in this case is thoughtfully reviewed, it is clear that the "Plaintiffs' Ninth Amendment claims are nothing more than a 'mere recasting' of their other constitutional

challenges". <u>Alharbi v. Miller</u>, 368 F Supp 3d 527, 569-570 (E.D.N.Y. 2019). The Plaintiffs eighth

claim under the Ninth Amendment must be dismissed.

**Point XII**

**PLAINTIFFS HAVE NO CLAIM UNDER THE TENTH AMENDMENT**

The Tenth Amendment states that the "[t]he powers not delegated to the United States by

the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the

people.". U.S. Const. Am. X. But the amendment makes clear that "the Constitution's conferral

upon Congress of not all governmental powers, but only discrete, enumerated ones". <u>Printz v.</u>

<u>United States</u>, 521 U.S. 898, 919 (1997); <u>see also</u> <u>New York v. United States</u>, 505 U.S. 144, 156

(1992). This language confirms that the Constitution "prohibits the federal government from

compelling the States to enact or administer a federal regulatory program". <u>New York v. United</u>

<u>States DOJ</u>, 951 F.3d 84, 112 (2d Cir. 2020).

Plaintiffs have alleged no facts which could plausibly assert that the Defendants, State

Officials, have somehow violated the Tenth Amendment. Only the Federal government, by

asserting a power not surrendered by the States or the people, can be alleged to have violated the

Tenth Amendment, since "its protections run to the states as against the federal government".

<u>Warren v. United States</u>, 859 F. Supp. 2d 522, 543 (W.D.N.Y. 2012). There are no Federal officials

named as defendants in this suit and the State Officials are Defendants, not Plaintiffs, in this action.

Plaintiffs have failed to allege a violation of the Tenth Amendment. Lastly, there is no private right

of action for enforcing the Tenth Amendment either.[8] <u>Montgomery v. Dept. of Corr.</u>, 2017 U.S.

---

[8]     To the extent Plaintiffs ask this Court to direct the State Legislature to legislate a certain way, or for an
order directing Defendant Cuomo to take specific legislative action pursuant to his duly delegated authority, such
relief would be barred by the Anti-Commandeering principle of the Tenth Amendment. See <u>New York v. United</u>
<u>States DOJ</u>, 964 F.3d 150, 163-164 (2d Cir. 2020). Similarly, Plaintiffs would not be able to seek a State court order
in the nature of mandamus compelling the State Legislature to act in any specific way either, as mandamus cannot
be used to compel discretionary legislative acts. See <u>Matter of Barhite v. Town of DeWitt</u>, 144 A.D.3d 1645, 1648

Dist. LEXIS 186974, at 12-13 (D. Conn. 2017); <u>Rivera v. FBI</u>, 2016 U.S. Dist. LEXIS 125041, at

10-11, n.4 (N.D.N.Y. 2016); <u>Warren</u>, <u>supra</u>.

**Point XIII**

**THERE IS NO CAUSE OF ACTION**
**ARISING OUT OF THE STATE CONSTITUTION'S "TAKE CARE" CLAUSE**

Plaintiff's ninth claim is one under the "Take Care" clause of New York's constitution.

Dkt. 5, ¶¶ 235-244. In pertinent part, Article IV, § 3 of the State Constitution states "[t]he governor

shall expedite all such measures as may be resolved upon by the legislature, <u>and </u>shall take care

that the laws are faithfully executed." <u>Id.</u> This clause has often been used to name the Governor as

a Defendant in lawsuits aimed at challenging the constitutionality of a statute (<u>Brown v. State of</u>

<u>NY</u>, 2015 N.Y. Slip Op 32599[U] (Sup. Ct. Erie Cnty. 2015)) or, in his official capacity, in a suit

pursuant to <u>Ex Parte Young</u>. <u>Wang v. Pataki</u>, 164 F. Supp. 2d 406 (S.D.N.Y. 2001); <u>Gras v Stevens</u>,

415 F. Supp. 1148 (S.D.N.Y. 1976).

While some courts have condoned this use of the "Take Care" clause to name the Governor

in his official capacity for <u>Ex Part Young</u> reasons[9], and the Second Circuit has never opined on

the matter, the majority view is against it. <u>Wang</u>, <u>supra</u> at 410; <u>Sabin v. Nelson</u>, 2014 U.S. Dist.

LEXIS 88462, at 6-7 (N.D.N.Y. 2014); <u>Nolan v. Cuomo</u>, 2013 U.S. Dist. LEXIS 6680, at 27-28

(E.D.N.Y. 2013); <u>United States v. New York</u>, 2007 U.S. Dist. LEXIS 21722 (N.D.N.Y. 2007);

<u>Warden v Pataki</u>, 35 F. Supp. 2d 354, 359 (S.D.N.Y. 1999); <u>Brown v. State of NY</u>, 2015 N.Y.

Slip. Op. 32599[U] (Sup. Ct. Erie Cnty. 2015) <u>rev'd on other grounds</u> <u>Brown v. State of NY</u>, 144

AD3d 88 (4th Dep't 2016). This is so due to the logical assertion that "a state official's duty to

execute the laws is not enough by itself to make that official a proper party in a suit challenging a

---

(4th Dep't 2016); <u>Matter of Mohr v. Greenan</u>, 10 Misc. 3d 610, 612-13 (Sup Ct. Erie. Cnty. 2005) <u>aff'd</u> 27 A.D.3d
1185 (4th Dep't 2005).
[9] e.g. <u>Association of American Medical Colleges v. Carey</u>, 482 F. Supp. 1358, 1364 (N.D.N.Y. 1980).

state statute." <u>Warden</u>, <u>supra</u> at 359 (citing <u>1st Westco Corp. v. School Dist.</u>, 6 F.3d 108, 113 (3d Cir. 1993)). "[W]here the legislative enactment provides that entities other than the executive branch of the state are responsible for implementation of the statute no claim against the Governor lies." <u>Wang</u>, <u>supra,</u> at 410. In the case at bar, and as discussed elsewhere, it is the Attorney General in New York who is the official responsible for enforcing the EOs, but only if the matter is referred to her by the DOH Commissioner. PHL § 12(5). Therefore, to the extent that the Court should consider the "take care" clause at all, it should be as a reason to dismiss Defendant Cuomo from this case.

In any event, aside from Executive Law § 29-a, this law suit does not name a statute which the Governor has not taken care to enforce, and, as has been shown elsewhere in this brief, Executive Law § 29-a is neither unconstitutional nor improperly applied. That being the case the Plaintiffs' "Take Care" claim must be dismissed.

## Point XIV

## PLAINTIFFS' CLAIM UNDER THE "COMPACTS CLAUSE" MUST BE DISMISSED

Plaintiffs allege that, on April 13, 2020, Governor Cuomo entered into a "regional compact, partnership and/or coalition" with Governors of northeastern states to combat the pandemic and coordinate the reopening of states without congressional approval. Dkt. ¶ 247. Pivoting from their prior characterization of Defendant Cuomo as a "tyran[t]" (Dkt. 5, ¶ 120), Plaintiffs now claim that neighboring governors "control, domineer and direct the public health and safety responsibilities" of the State of New York. <u>Id.</u> ¶ 248. Plaintiffs demand a declaration that Governor Cuomo violated the Compact Clause and ask the Court to enjoin Governor Cuomo from continuing to engage with other governors in any and all compacts absent the approval of Congress. <u>Id.</u> ¶ 249.

46

The claim fails for numerous reasons. First, Plaintiffs lack standing to bring such a claim because they do not allege any injury arising from it. See, e.g., Mariana v. Fischer, 338 F.3d 189 (3d Cir. 2003) (finding plaintiff lacked standing to bring Compact Clause claim because it failed to make particularized, concrete allegations of injury in fact), cert. denied, 540 U.S. 1179 (2004).

Second, over a hundred years ago, the Supreme Court made clear that the Compact Clause could not reasonably be read to apply to every agreement among multiple states. In Virginia v. Tennessee, 148 U.S. 503, 518-19 (1893), not only did the Court observe that many interstate agreements "can in no respect concern the United States," it specifically said "it would be the height of absurdity" to hold that states threatened with sickness and death could not unite to prevent and repel the pestilence without congressional approval. Id. at 518. Similarly, it would also be the height of absurdity for Plaintiffs to suggest that northeastern states threatened by the COVID-19 pandemic were not permitted to work together to prevent and repel the pandemic.

Third, Plaintiffs fail to cite to any alleged compact or set forth its terms. Merely alleging that Governor Cuomo allows other Governors to "control, domineer and direct the public health and safety responsibilities" of the State does not constitute a compact under the purview of the Compact Clause. Analyzed under compact law, there are three "classic indicia" of a binding regulatory compact: (1) a joint regulatory body; (2) state enactment that requires reciprocal action to be effective; and (3) the prohibition of unilateral repeal or modification. Northeastern Bancorp, Inc. v. Bd. of Governors of Fed. Reserve Sys., 472 U.S. 159, 179 (1985). Plaintiffs have not alleged, nor can they show, any of them.

Plaintiffs have not asserted that a joint regulatory body, contract, regulation, passage of law, or agreement binds any of the states. Nor have they asserted that some entity has regulatory powers. Plaintiffs cannot contest that each state is free to make its own decisions concerning

reopening of schools, restaurants, gyms, public events, churches, businesses, and the like. Plaintiffs have not alleged and cannot show that the alleged compact has a formal enforcement mechanism, cedes state sovereignty or delegates any governing power to a compact-created agency either. Thus, Plaintiffs cannot show a compact that falls under the Compact Clause. See, e.g., United States Steel Corp. v. Multistate Tax Comm'n, 434 U.S. 452, 473 (1978).

Even if all indicia of a compact were present, only agreements that tend to "increase political power in the states," such that they "may encroach upon or interfere with the just supremacy of the United States" fall within the scope of the Compact Clause. Id. at 481; New Hampshire v. Maine, 426 U.S. 363, 369 (1976). In U.S. Steel, the Supreme Court offered three factors which, if present in an agreement between states, could "enhance state power in quoad the National Government": (1) if the agreement in question authorized member states to "exercise any powers they could not exercise in its absence"; (2) if there was any "delegation of sovereign power" to an outside organization; and (3) if each state was "free to withdraw at any time." 434 U.S. at 473. Here, Plaintiffs have not alleged any provision of the purported compact that enhances the political power of any alleged member States in a way that encroaches upon the supremacy of the United States. Plaintiffs have not alleged, nor can they, that a compact authorizes member States to exercise any powers they could not exercise in the absence of a pact. There is no delegation of sovereign power to a commission or group. In the end, Plaintiffs complain about a what may be a voluntary agreement to share resources and information. Since the Plaintiffs provide no details, we do not know. However, as the Supreme Court made clear, the Compact Clause is "not to be construed to limit the variety of arrangements which are possible through the voluntary and cooperative actions of individual States with a view to increasing harmony within the federalism created by the Constitution." People of State of N.Y. v. O'Neil, 359 U.S. 1, 6 (1959).

48

"Far from being divisive," a multi-state counsel could be a "catalyst of cohesion" that "is within the unrestricted area of action left to the States by the Constitution." Id. at 6. As such, Plaintiffs' Compact Clause claim fails as a matter of law.

**Point XV**

**THE PLAINTIFF'S CLAIM FOR ATTORNEYS' FEES MUST BE DISMISSED**

Plaintiffs' eleventh claim is one for attorneys' fees resulting from this action. Plaintiffs brings this claim pursuant to 42 USC § 1988. Dkt. 5, ¶¶ 250-255, k.  This claim must also be dismissed since § 1988 does not in itself create a right of action. Artemov v. Ramos, 2018 U.S. Dist. LEXIS 77556, at 5 (E.D.N.Y. May 8, 2018) (citing Vecchia v. Town of North Hempstead, 927 F. Supp. 579, 580-81 (E.D.N.Y. 1996)).  It is simply a fee-shifting statute.

**CONCLUSION**

Plaintiffs' claims are beyond the Court's jurisdiction and meritless. Therefore, the Amended Complaint should be dismissed in its entirety.

Dated:  Buffalo, New York
         September 21, 2020

                                    Respectfully submitted,

                                    LETITIA JAMES
                                    Attorney General of the State of New York
                                    Attorney for Defendants Attorney for Defendants
                                    ANDREW M. CUOMO,
                                    LETITIA JAMES,
                                    NEW YORK STATE ASSEMBLY, and
                                    NEW YORK STATE SENATE
                                    /s/ George Michael Zimmermann
                                    By: GEORGE MICHAEL ZIMMERMANN and
                                    JOEL J. TERRAGNOLI
                                    Assistant Attorneys General of Counsel
                                    Main Place Tower, Suite 300A
                                    350 Main Street
                                    Buffalo, NY 14202
                                    (716) 853-8444
                                    George.Zimmermann@ag.ny.gov
                                    Joel.Terragnoli@ag.ny.gov