UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

BIMBER'S DELWOOD, INC.,
BISON BILLIARDS, INC.,
FIVE STAR LANES, INC.,
FOUR ACES BAR & GRILL,
KARATE KEN'S, LTD,
PHARAOHS GC, INC.,
SOONERTUNES PRODUCTIONS,
THE BODY SHOP GENTLEMEN'S CLUB, INC.,
and THE COWBOY OF CHIPPEWA, INC.,

                           Plaintiffs,

     v.

LETITIA A. JAMES,
       *In her official capacity as the Attorney*
       *General for the State of New York*,
ANDREW M. CUOMO,
       *In his official capacity as Governor of*
       *the State of New York*,
NEW YORK STATE ASSEMBLY, and
NEW YORK STATE SENATE,

                   Defendants.

**DECISION AND ORDER**
20-CV-1043S

## I. INTRODUCTION

In this case, nine area businesses challenge and move to enjoin New York

Governor Andrew M. Cuomo's Executive Orders issued in response to the COVID-19

outbreak.   Defendants oppose Plaintiffs' motion for injunctive relief and move to dismiss

each of their claims.   Because this Court finds that Plaintiffs have failed to demonstrate

that the challenged Executive Orders likely fall outside the State's valid exercise of its

police powers, Plaintiffs' motion for a temporary restraining order and preliminary

injunction will be denied, Defendants' cross-motion to dismiss will be granted, and

Plaintiffs will be afforded leave to file a second amended complaint.

## II. BACKGROUND

The nine plaintiffs are local businesses.   Seven of them are bars or restaurants that offer live music and are licensed to serve alcohol: Bimber's Delwood, Inc.; Bison Billiards, Inc.; Five Star Lanes, Inc.; Four Aces Bar & Grill; Pharaohs GC, Inc.; The Body Shop Gentlemen's Club, Inc.; and The Cowboy of Chippewa, Inc.   (Amended Complaint, Docket No. 5, ¶¶ 5-8, 10, 12, 13, 25, 26.)   Of these seven, four explicitly offer some form of entertainment: Bison Billiards is a billiards hall; Five Star Lanes is a bowling alley; Pharaohs and The Body Shop provide exotic dancing.   (Id. ¶¶ 6, 7, 10, 12, 26, 27.)   The two other plaintiffs are Karate Ken's, Ltd., a martial arts school, and Soonertunes Productions, an entertainment company that provides disc jockey and karaoke services. (Id. ¶¶ 9, 11, 28, 29.)

Defendants Andrew M. Cuomo and Letitia A. James are the Governor and Attorney General of the State of New York, respectively.   (Id. ¶¶ 14, 15.)   James is alleged to have interpreted, ratified, and enforced Governor Cuomo's Executive Orders.   (Id. ¶¶ 30, 31, 33.)   They are each sued in their official capacity.   (Id. ¶¶ 30, 31.)   The other two defendants are the New York State Senate and New York State Assembly.   (Id. ¶¶ 16, 17.)

### A.    Plaintiffs' Amended Complaint

Plaintiffs' amended complaint comes against the backdrop of the COVID-19 epidemic and the State's response to it.   COVID-19 is a novel, potentially lethal respiratory disease for which there is no known cure, no effective treatment, and no

vaccine.   See S. Bay United Pentecostal Church v. Newsom, __ U.S. __, 140 S. Ct. 1613, 1613, 207 L. Ed. 2d 154 (2020) (Roberts, C.J., concurring in denial of application for injunctive relief).   It spreads rapidly by person-to-person transmission, and it has caused an epidemic the likes of which has not been seen in this country since 1918. New infections and more deaths occur daily.   There have been 488,506 cases and 25,679 deaths in New York alone,[1] with more than 200,000 deaths nationwide and 1 million deaths worldwide.

In early 2020, the New York legislature recognized COVID-19 as an imminent public-health crisis.   In response, it passed Senate Bill S7919 on March 2, 2020, which amended §§ 20 and 29-a of the New York Executive Law to provide Governor Cuomo the legal authority necessary to confront this public-health emergency.   The legislature found such action necessary "to allow New York to manage, prepare, respond to, and contain" the threat posed by the coronavirus and to "respond with appropriate action to protect public health and welfare."   See S.B. S7919, 2020 Leg. (N.Y. 2020).   As amended, § 29-a authorizes the governor, inter alia, to temporarily suspend laws and issue Executive Orders as necessary to assist in coping with a declared state disaster emergency.   See N.Y. Exec. L., Art. 2-B, § 29-a (1).

The rapid spread of COVID-19 soon caused Governor Cuomo to declare a state disaster emergency on March 7, 2020, with the President of the United States proclaiming a national emergency on March 13, 2020.   See N.Y. Exec. Order No. 202 (March 7,

---

1 See https://covid19tracker.health.ny.gov/views/NYS-COVID19-Tracker/NYSDOHCOVID-19Tracker-Map?%3Aembed=yes&%3Atoolbar=no&%3Atabs=n (last visited October 21, 2020).

2020);[2] Proclamation No. 9994, 85 Fed. Reg. 15,337-38 (March 13, 2020); Amended Complaint, ¶ 47.   Governor Cuomo then began issuing Executive Orders pursuant to § 29-a that limited many facets of everyday life in New York, including restricting the operation of businesses holding liquor licenses, imposing capacity-based restrictions on certain venues, limiting large gatherings, limiting entertainment activities such as billiards and bowling, and restricting food and beverage services.   (Amended Complaint, ¶¶ 25, 40, 44, 48, 54-59, 61-65, 84.)

In late April 2020, Governor Cuomo announced a plan for phased re-opening of New York businesses called "New York Forward."   (Id. ¶ 49.)   Under this plan, certain sectors and industries with the greatest economic impacts and inherently low risks of infection were permitted to re-open and certain restrictions were loosened on a regional basis, in line with risk-of-infection rates.   (Id. ¶¶ 41, 49, 50.)

On June 16, 2020, the Western New York region, where Plaintiffs are each situated, entered Phase 3 of the "New York Forward" plan, which allowed, among other things, restaurants and bars to re-open with restrictions.   (Id. ¶¶ 51-53, 57.)   Those restrictions initially provided for only outdoor dining and imposed open-container monitoring obligations.   (Id. ¶¶ 54, 58.)   Indoor dining was thereafter permitted under strict guidelines, including social distancing, mask wearing, and other coronavirus-related protocols.   (Id. ¶¶ 56-58.)   Restrictions also applied to alcohol service, including requiring that a food item be purchased with any alcoholic beverage to reduce the

---

2 All Executive Orders cited herein are available at https://www.governor.ny.gov/executiveorders (last visited October 16, 2020).

congregation and mingling that arise in a typical bar setting.   (Id. ¶¶ 61-63.)

Plaintiffs maintain that Governor Cuomo's Executive Orders are illegal.   They allege that the Orders violate the separation-of-powers doctrine (id. ¶¶ 32-34, 36, 37, 39, 93); that § 29-a, as amended, is unconstitutional (id. ¶ 93); that Governor Cuomo has been "unlawfully legislating from the Executive Chamber" and has "taken over the role of the [legislature]" (id. ¶¶ 33, 39); that the New York State Senate and New York State Assembly have "attempted to delegate non-delegable legislative authority to a single executive" (id. ¶¶ 37, 85, 86, 91, 93); and that Attorney General James has failed to fulfill her obligation to enforce the laws by "permit[ing], ratif[ying], fail[ing] to oppose, and fail[ing] to contest" the separation-of-powers violations (id. ¶¶ 32, 33).

Plaintiffs complain that Governor Cuomo has issued more than 59 Executive Orders "without review, debate and careful consideration of both houses of the New York State Legislature, all with the imprimatur of [Attorney General James]."   (Id. ¶¶ 34, 39, 84.)   They further allege that by engaging in these unlawful acts, Defendants have violated their oaths of office and have "permitted the State of New York to take on the governmental attributes of a monarchy."   (Id. ¶¶ 36, 37, 39, 84.)

So too, Plaintiffs allege that the Executive Orders, including the "phase in" schedules, are "vague, inconsistent, and contradictory," and have unduly and profoundly ceased, curtailed, limited, or devastated their business operations, causing "operational chaos."   (Amended Complaint, ¶¶ 5-13, 30, 31, 38, 41-43, 46, 77, 94.)   As an example of inconsistency, Plaintiffs allege that restaurant and bars are included in the phased re-

opening plans, but bowling alleys,[3] billiard halls, and physical fitness studios and gyms are not.   (Id. ¶¶ 41, 51.)

Plaintiffs also challenge the need for and efficacy of the government-mandated precautions.   (Id. ¶ 82.)   They allege that the State-imposed safety precautions are "based upon medical disinformation, publicized by an agenda-driven media conglomerate of news networks and complicit journalists."   (Id. ¶ 103.)   They maintain that social distancing is "absurd" and makes it "virtually impossible" to run their businesses.   (Id. ¶ 101.)   They further allege that "keeping customers and employees six (6) feet apart render[s] [their] businesses unworkable" and poses an "insurmountable dilemma."   (Id. ¶ 102.)   Plaintiffs insist that they should instead be permitted to exercise their own judgment in establishing safety and health protocols in the best interests of their employees, patrons, and other visitors, without government intervention.   (Id. ¶¶ 82, 83.)

Nonetheless, the restaurant and bar plaintiffs allege that they are complying with the government mandates and are operating their businesses according to the regulations as they understand them and in a manner that exceeds the State-imposed safety protocols and restrictions.   (Id. ¶¶ 46, 59, 68, 69, 102.)   They are doing so with the goal of returning to profitability, but also under "constant fear" and "constant threats" of being shut down by governmental agencies.   (Id. ¶¶ 45, 46, 69.)

Pharaohs and The Body Shop, however, allege that they are not permitted to fully re-open because exotic dancing is prohibited.   (Id. ¶¶ 67, 70, 74.)   The Body Shop has

---

3 Although Plaintiffs allege that bowling alleys "are not part of any phased reopening," they elsewhere allege that "bowling alleys are permitted to have as many teams play as they wish, as long as there is a separation by one bowling lane."   (Compare Amended Complaint, ¶ 41 with id. ¶ 44.)

thus been closed since early March 2020; Pharaohs closed in July 2020, but has tried to re-open on a limited basis to salvage its business.   (Id. ¶¶ 70, 71.)

**B.     The State's Justification for the Executive Orders**

Defendants have submitted the Declaration of Elizabeth M. Dufort, M.D., FAAP, Medical Director of the New York State Department of Health, Division of Epidemiology. (Declaration of Elizabeth M. Dufort, M.D., FAAP ("Dufort Decl."), Docket No. 15-2, ¶ 1.) Dr. Dufort's duties include coordinating the Department of Health's efforts to prevent the spread of communicable diseases, improve vaccination, prevent vaccine-preventable diseases, prevent and track healthcare-associated infections, and respond to emerging infectious-disease outbreaks.   (Id.)   As relevant here, Dr. Dufort coordinates the State's COVID-19 response team, serves as subject-matter expert on COVID-19, and directs various CDC[4]-funded COVID-19 programs.   (Id. ¶ 4.)

Dr. Dufort explains that COVID-19 is a highly infectious and potentially deadly respiratory disease from which humans have no pre-existing immunity.   (Id. ¶¶ 7, 8.)   It is thought to have an incubation period of 14 days.   (Id. ¶ 13.)   Transmission can occur through direct or indirect contact and through oral and respiratory secretions, such as those expelled when an infected person coughs, sneezes, talks, or sings.   (Id. ¶ 12.) The disease may also spread via poor ventilation in indoor settings, and it may remain viable for hours to days on a variety of surfaces.   (Id.)

According to Dr. Dufort, social distancing is one of the best ways to limit

---

4 Referring to the Centers for Disease Control and Prevention.

transmission of COVID-19.   (Id. ¶ 13.)   This is consistent with CDC guidance, which recommends that people employ social-distancing measures and limit face-to-face contact with others.   (Id. ¶ 14.)   The CDC recommends keeping six feet away from other people and limiting close contact with non-household members, including avoiding groups and crowded places.   (Id. ¶ 15.)   Such measures limit exposure to infected people and contaminated surfaces.   (Id.)

Dr. Dufort explains that the social-distancing and other preventative measures mandated by Governor Cuomo's Executive Orders were developed in consultation with medical and scientific professionals in the New York State Department of Health and were enacted to contain the rapid spread of COVID-19 and to mitigate the "grave threat" it posed.   (Id. ¶¶ 16, 26, 44, 54.)   Faced with exponentially soaring cases—a single case on March 1, 2020; 60 cases by March 7; roughly 10,000 cases by March 20; and more than 267,000 cases by April 20[5]—the State imposed measures to "flatten the curve" as a way to avoid overwhelming its healthcare system.   (Id. ¶¶ 18-22, 26, 37.)   For example, the State imposed immediate restrictions on the operation of non-essential businesses and indoor gatherings to ensure sufficient space for proper distancing, thereby reducing potential transmission rates.   (Id. ¶¶ 54, 55.)

Collectively known as "New York On Pause," these Executive Orders closed non-essential businesses statewide; canceled non-essential gatherings of any size for any reason; required social distancing of at least six feet; and encouraged individuals to

---

5  Dr. Dufort represents that at the worst stage of the epidemic, New York had more COVID-19 cases than any single *country* in the world.   (Dufort Decl., ¶ 25 (emphasis added).)

practice hand hygiene and limit outdoor recreational activities and use of public transportation to avoid close contact with others.   (Id. ¶¶ 29-36.)   Dr. Dufort states that adherence to these measures successfully "flattened the curve," as the number of COVID-19 cases in New York has steadily declined since the end of April 2020.   (Id. ¶¶ 16, 37, 39.)

Due to this success, the State transitioned from "New York On Pause" to "New York Forward," which provides for a phased re-opening.   (Id. ¶ 38.)   Four phases were created to guide essential and non-essential businesses and entities on how to remain open or to re-open.   (Id.)   At this time, the entire state is in the final phase: Phase 4. (Id. ¶ 39.)

Dr. Dufort represents that adherence to the Executive Orders and other guidelines has successfully reduced the spread of the virus in New York.   (Id. ¶ 42.)   Both the number of cases and the transmission rate dropped during "New York on Pause."   (Id. ¶¶ 42, 43.)   But Dr. Dufort warns that the fight is not over.   (Id. ¶¶ 45-49.)   She maintains that continued adherence to the mandates in the Executive Orders is required to avoid a "devastating resurgence" of the disease in New York, and she notes that implementation of "New York Forward," even with its continued restrictions, resulted in the transmission rate rising slightly through the four phases, with it surpassing the "critical" 1.0% mark on September 21, 2020, at 1.04%.   (Id. ¶¶ 16, 43, 116.)

## C.   Plaintiffs' Claims

Plaintiffs bring 11 causes of action.

Plaintiffs' federal claims, brought pursuant to 42 U.S.C. § 1983, allege violations

of the following constitutional provisions: (1) Guarantee Clause (Art. IV, § 4) (Amended Complaint, ¶¶ 116-120); (2) First Amendment Free Speech and Fourteenth Amendment Equal Protection Clauses (id. ¶¶ 163-177); (3) Fifth and Fourteenth Amendment Substantive Due Process Clauses (id. ¶¶ 178-195); (4) Fifth and Fourteenth Amendment Procedural Due Process Clauses (id. ¶¶ 196-200); (5) Fifth Amendment Takings Clause (id. ¶¶ 201-215); (6) Fourteenth Amendment Equal Protection Clause (id. ¶¶ 216-227); (7) Ninth and Tenth Amendments (id. ¶¶ 228-234); and (8) the Compact Clause (Art. 1, § 10) (id. ¶¶ 245-249).   Plaintiffs also seek attorney's fees and costs under 42 U.S.C. § 1988.   (Id. ¶¶ 250-255.)

Plaintiffs' state-law claims allege that (1) § 29-a is facially and substantively unconstitutional under the New York Constitution (id. ¶¶ 116-118; 121-144); (2) Governor Cuomo exceeded the scope of his authority under § 29-a (id. ¶¶ 145-162); and (3) Governor Cuomo violated the Take Care Clause of the New York Constitution (id. ¶¶ 235-244).

Plaintiffs seek a declaratory judgment that § 29-a is facially and substantively unconstitutional, that Governor Cuomo exceeded his authority under § 29-a, and that the prohibition on exotic dancing is unconstitutional.   (Id., Wherefore Clause, ¶¶ a-c.) Plaintiffs further seek an Order permanently enjoining Defendants from enforcing the Executive Orders in violation of their rights set forth in the amended complaint.   (Id., Wherefore Clause, ¶¶ c-j.)   Finally, Plaintiffs seek compensatory damages on their Takings Clause claim and attorney's fees and costs.   (Id. ¶¶ 215; id., Wherefore Clause, ¶ k.)

### D.    Procedural History

Plaintiffs initiated this action on August 7, 2020, and filed an amended complaint on August 27, 2020.   (Docket Nos. 1, 5.)   Four days later, they moved for a temporary restraining order and preliminary injunction.   (Docket No. 7.)   After assignment of the case here on September 3, 2020, this Court conducted a conference with counsel on September 15, 2020, at which a briefing schedule was discussed and issued.   (Docket Nos. 9, 14.)   Defendants thereafter cross moved to dismiss (Docket No. 15), with briefing on all motions concluded on September 29, 2020.   In the absence of a need for a hearing or oral argument, this Court took the motions under advisement at that time.[6]

### III. MOTION FOR INJUNCTIVE RELIEF

### A.    Legal Standard

The standard for issuance of a temporary restraining order is identical to that for issuance of a preliminary injunction.   See Grant v. Decker, 20 Civ. 2946 (AKH), 2020 WL 3402445, at *4 (S.D.N.Y. June 19, 2020).   "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."   Univ. of Tex. v. Camenisch, 451 U.S. 390, 395, 101 S. Ct. 1830, 68 L. Ed. 2d 175 (1981).   It is an extraordinary and drastic remedy; one not awarded as a matter of right or entitlement.   See Munaf v. Geren, 553 U.S. 674, 689-90, 128 S. Ct. 2207, 171 L. Ed. 2d 1 (2008); Weinberger v. Romero-Barcelo, 456 U.S. 305, 311, 102 S. Ct. 1798, 72 L.

---

6 At the status conference, this Court directed Plaintiffs' counsel to set forth in his reply memorandum whether Plaintiffs request a hearing and, if so, to outline the scope of any such hearing.   Plaintiffs did not request a hearing in their reply memorandum and instead submitted affidavits from several of the plaintiffs. (Docket Nos. 19-1, 19-2, 19-3, 19-4, 19-5.)   Upon review, this Court likewise finds a hearing unnecessary.

Ed. 2d 91 (1982).

A party seeking to enjoin governmental action taken pursuant to a statute, as Plaintiffs seek to do here, must demonstrate that (1) he or she is likely to succeed on the merits, (2) he or she will suffer irreparable harm absent injunctive relief, (3) the balance of equities tips in his or her favor, and (4) the issuance of an injunction is in the public interest.  See Yang v. Kosinski, 960 F.3d 119, 127 (2d Cir. 2020) (citing Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008) and Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton, 841 F.3d 133, 143 (2d Cir. 2016)).

But where, as here, a party seeks a "mandatory preliminary injunction"—one that seeks to modify the status quo—and where issuance of the requested injunction will provide the party substantially all the relief it seeks, a heightened standard applies.   In such a case, the party must demonstrate a "clear or substantial" likelihood of success on the merits and make a "strong showing" of irreparable harm.   Yang, 960 F.3d at 127-28 (citations omitted).   Requiring such a heightened showing is consistent with the principle that "governmental policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly."   Able v. United States, 44 F.3d 128, 131 (2d Cir. 1995) (per curiam).

**B.   The Parties' Arguments**

Plaintiffs argue that Governor Cuomo's Executive Orders run afoul of the separation-of-powers doctrine and violate both the federal and New York constitutions.

They contend that they are likely to succeed on the merits of each of their causes of action, and that they will suffer irreparable harm to their constitutional rights and the solvency of their businesses if enforcement of the Executive Orders is not enjoined. Plaintiffs further maintain that the balance of equities and the public interest weigh in their favor, since their businesses are at stake and they will implement and follow safety and sanitizing protocols that exceed government mandates.

In response, Defendants argue that Plaintiffs are neither likely to succeed on the merits of their claims nor to suffer irreparable injury.   They argue that because issuance of the Executive Orders is an exercise of the State's police power, it is squarely protected by the Tenth Amendment and permissible under the deferential standard set forth in Jacobson v. Massachusetts.   197 U.S. 11, 25 S. Ct. 358, 49 L. Ed. 643 (1905). Defendants further argue that Plaintiffs are unlikely to succeed on their causes of action because they fail to state claims upon which relief can be granted.   Moreover, Defendants contend that Plaintiffs' request for compensatory damages is an admission that money damages will make them whole, which precludes a finding of irreparable harm.   Finally, Defendants argue that the balance of equities and the public interest tip in favor of the State's continuing efforts to combat the virus and protect public health.

**C.    Analysis**

**1.    Plaintiffs do not demonstrate a clear or substantial likelihood of success on the merits of their claims.**

**a.    <u>Jacobson</u> Review**

In <u>Jacobson v. Massachusetts</u>, decided more than 100 years ago, the United States Supreme Court developed the framework governing emergency public health and public safety measures.   Considering a Massachusetts mandatory-vaccination statute enacted to combat a smallpox epidemic, the Court rejected Jacobson's Fourteenth Amendment claim that the law violated his right to personal autonomy.   <u>Jacobson</u>, 197 U.S. at 29.   It instead found that "the liberty secured by the Constitution . . . does not import an absolute right in each person to be, at all times and in all circumstances, wholly freed from restraint."   <u>Jacobson</u>, 197 U.S. at 26.

In so finding, the Court defined the expanse of the State police power, holding that "the rights of the individual in respect of his liberty may at times, under the pressure of great dangers, be subjected to such restraint, to be enforced by reasonable regulations, as the safety of the general public may demand."   <u>Jacobson</u>, 197 U.S. at 29.   Reserved to the States under the Tenth Amendment, the police power encompasses such power and authority reasonably necessary to "guard and protect" public health and public safety, including protecting communities "against an epidemic of disease which threatens the safety of its members."   <u>Id.</u> at 27, 38; <u>see also</u> <u>Barnes v. Glen Theatre, Inc.</u>, 501 U.S. 560, 569, 111 S. Ct. 2456, 115 L. Ed. 2d 504 (1991) ("The traditional police power of the States is defined as the authority to provide for the public health, safety, and morals . . .

14

.").

As relevant here, State officials have especially broad authority when they "undertake to act in areas fraught with medical and scientific uncertainties." S. Bay United Pentecostal Church, 140 S. Ct. at 1613 (involving temporary numerical restrictions on public gatherings to combat COVID-19); see also Legacy Church, Inc. v. Kunkel, 455 F. Supp. 3d 1100, 1146 (D.N.M. 2020) ("when the state faces a major public health threat, . . . its Tenth Amendment police and public health powers are at a maximum").   As the Fifth Circuit succinctly puts it: "Jacobson instructs that *all* constitutional rights may be reasonably restricted to combat a public health emergency."   In re Abbott, 954 F.3d 772, 786 (5th Cir. 2020) (emphasis in original).

But the police power is not absolute.   The Jacobson court recognized that "the police power of a state . . . may be exerted in such circumstances, or by regulations so arbitrary and oppressive in particular cases, as to justify the interference of the courts to prevent wrong and oppression."   Jacobson, 197 U.S. at 38.   Circumscribed judicial review is therefore employed to ensure that actions taken under the guise of the police power do not invade federal authority or violate rights secured by the Constitution.   See id. at 28.

Under the highly deferential Jacobson standard, courts are authorized to review only whether "a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law."   Jacobson, 197 U.S. at 28, 31 (citations omitted); see also DiMartile v. Cuomo,

1:20-CV-0859, 2020 WL 4558711, at *8 (N.D.N.Y. Aug. 7, 2020) (discussing the police power in relation to the COVID-19 pandemic).   This review encompasses "asking whether power has been exercised in an 'arbitrary, unreasonable manner,' or through 'arbitrary and oppressive' regulations."   In re Abbott, 954 F.3d at 784 (citing Jacobson, 197 U.S. at 28, 38); see also Lawton v. Steele, 152 U.S. 133, 136, 14 S. Ct. 499, 38 L. Ed. 385 (1894) ("To justify the state in thus interposing its authority in behalf of the public, it must appear—First, that the interests of the public generally, as distinguished from those of a particular class, require such interference; and, second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals.").

This limited review, however, does not permit courts to pass judgment on the "wisdom and efficacy" of the emergency measures implemented.   In re Abbott, 954 F.3d at 783.   To do so would impermissibly "usurp the functions of another branch of government."   Jacobson, 197 U.S. at 28.   Accordingly, where state officials act within their authority, they "should not be subject to second-guessing by an 'unelected federal judiciary,' which lacks the background, competence, and expertise to assess public health and is not accountable to the people."   S. Bay United Pentecostal Church, 140 S. Ct. at 1613-14 (citing Garcia v. San Antonio Metro. Transit Auth., 469 U.S. 528, 545, 105 S. Ct. 1005, 83 L. Ed. 2d 1016 (1985)); see also Jacobson, 197 U.S. at 35 ("no court . . . is justified in disregarding the action of the legislature simply because in its or their opinion that particular method was—perhaps, or possibly—not the best").

###### b. **Jacobson** review applies.

"[States] undoubtedly ha[ve] a compelling interest in combating the spread of COVID-19 and protecting the health of [their] citizens." S. Bay United Pentecostal Church, 140 S. Ct. at 1614 (Kavanaugh, J., dissenting from denial of application for injunctive relief). Here, Plaintiffs acknowledge that the COVID-19 outbreak is a "calamity" and a "crisis" (Amended Complaint, ¶¶ 115, 127), and that Governor Cuomo issued his Executive Orders in response to this pandemic (id. ¶ 84). And although Plaintiffs challenge the constitutionality of § 29-a and the need for and scope of the Executive Orders issued under that provision, they do not contest that the Orders are grounded in that statute, which was specifically amended "to allow for the protection of the health and safety of New Yorkers due to the threat of the novel coronavirus." (Id. ¶¶ 91, 93, 146-162.) This Court therefore finds that Defendants are acting under their police power to protect the public health and public safety. The State's emergency measures are thus subject to Jacobson review. See In re Abbott, 954 F.3d at 785 (faulting the district court for "ignor[ing] the [Jacobson] framework governing emergency public health measures"); In re Rutledge, 956 F.3d 1018, 1028 (8th Cir. 2020) ("[T]he district court's failure to apply the Jacobson framework produced a patently erroneous result.")

In reaching this conclusion, this Court has considered Plaintiffs' position that Jacobson does not apply. Plaintiffs first suggest that Jacobson's application is questionable because it is an old case decided before the Supreme Court's development of the tiered scrutiny commonly employed in constitutional analysis. But age alone does not diminish the precedential value of a decision, particularly one of the Supreme Court,

17

and Plaintiffs point to no authority overruling <u>Jacobson's</u> application to measures employed by a state to combat a public-health emergency. <u>See</u> <u>League of Indep. Fitness Facilities & Trainers, Inc. v. Whitmer</u>, 814 F. App'x 125, 127-28 (6th Cir. 2020) (referring to <u>Jacobson</u> as a "century-old historical principle [that] has been reaffirmed just this year by a chorus of judicial voices"); <u>Altman v. Cnty. of Santa Clara</u>, Case No. 20-cv-02180-JST, 2020 WL 2850291, at *7 (N.D. Ca. June 2, 2020) (dismissing argument that <u>Jacobson</u> is "arcane constitutional jurisprudence" and finding rather that "the case remains alive and well—including during the present pandemic").

Indeed, the overwhelming majority of courts resolving constitutional challenges to COVID-19-related measures employ <u>Jacobson</u>. <u>See, e.g.</u>, <u>Bill & Ted's Riviera, Inc. v. Cuomo</u>, 1:20-CV-1001 (FJS/TWD), 2020 WL 6043991, at *3-6 (N.D.N.Y. Oct. 13, 2020) (denying injunctive relief aimed at COVID-19 gathering restrictions under <u>Jacobson</u>); <u>Luke's Catering Serv. v. Cuomo</u>, 20-CV-1086S, 2020 WL 5425008, at *5-7 (W.D.N.Y. Sept. 10, 2020) (upholding gathering restriction under <u>Jacobson</u>); <u>Martin v. Warren</u>, 20-CV-6538 CJS, 2020 WL 5035612, at *19 (W.D.N.Y. Aug. 26, 2020) (applying <u>Jacobson</u> in the course of denying request to enjoin public-gathering restriction partially intended to prevent the spread of COVID-19); <u>Page v. Cuomo</u>, 1:20-CV-732, 2020 WL 4589329, at *8 (N.D.N.Y. Aug. 11, 2020) (applying <u>Jacobson</u> and noting that "courts across the country have nearly uniformly relied on <u>Jacobson's</u> framework to analyze emergency public health measures put in place to curb the spread of coronavirus") (collecting cases); <u>McCarthy v. Cuomo</u>, 20-CV-2124 (ARR), 2020 WL 3286530, at *3 (E.D.N.Y. June 18, 2020) (listing COVID-19 cases employing <u>Jacobson</u> standard).

18

This includes multiple circuit courts of appeals.  See League of Indep. Fitness Facilities & Trainers, 814 F. App'x at 127-28 (applying Jacobson and finding that "the police power retained by the states empowers state officials to address pandemics such as COVID-19 largely without interference from the courts"); Elim Romanian Pentecostal Church v. Pritzker, No. 20-1811, 2020 WL 2517093, at *1 (7th Cir. May 16, 2020) (per curiam) (citing Jacobson); In re Rutledge, 956 F.3d 1018, 1028 (8th Cir. 2020) (faulting district court for failing to apply Jacobson analysis to Governor's COVID-19-related Executive Order); In re Abbott, 954 F.3d at 786 (referring to Jacobson as "the controlling Supreme Court precedent that squarely governs judicial review of rights-challenges to emergency public health measures").

Jacobson thus remains good law.  See, e.g., Kansas v. Hendricks, 521 U.S. 346, 356-57, 117 S. Ct. 2072, 138 L. Ed. 2d 501 (1997) (recognizing that under Jacobson, "an individual's constitutionally protected interest in avoiding physical restraint may be overridden even in the civil context").

Plaintiffs next argue that Jacobson should not apply because its holding has been criticized and called into question.  To be sure, Jacobson has its detractors, see, e.g., Cnty. of Butler v. Wolf, No. 2:20-cv-677, 2020 WL 5510690, at *6-10 (W.D. Pa. Sept. 14, 2020) (declining to apply Jacobson); Page, 2020 WL 4589329, at *7-8 (noting criticism); Bayley's Campground, Inc. v. Mills, No. 2:20-cv-00176-LEW, 2020 WL 2791797, at *8 (D. Me. May 29, 2020) (declining to apply Jacobson and noting that it "has been thoughtfully criticized by legal scholars for lacking in limiting principles characteristic of legal standards"), with Justice Alito chiefly among them, see Calvary Chapel Dayton Valley v.

19

<u>Sisolak</u>, __ U.S. __, 140 S. Ct. 2603, 2608, __ L. Ed. 2d __ (2020) (Alito, J., dissenting from denial of application for injunctive relief) (suggesting that "it is a mistake to take language in <u>Jacobson</u> as the last word on what the Constitution allows public officials to do during the COVID-19 pandemic").   Even so, until the Supreme Court overrules <u>Jacobson</u>, it remains good law, and it governs here.

State action taken pursuant to the police power is upheld under <u>Jacobson</u> unless it has "no real or substantial relation" to protecting public health or public safety or is "beyond all question, a plain palpable invasion of rights."   <u>See</u> <u>Jacobson</u>, 197 U.S. at 28, 31; <u>Ass'n of Jewish Camp Operators v. Cuomo</u>, 1:20-CV-687 (GTS/DJS), 2020 WL 3766496, at *7-10 (N.D.N.Y. July 6, 2020) (applying the <u>Jacobson</u> standard to plaintiffs' challenge to COVID-19-related Executive Orders).   Plaintiffs have not demonstrated a "clear or substantial" likelihood that they can successfully make either showing.   <u>Yang</u>, 960 F.3d at 127-28.

### c. Plaintiffs have not demonstrated a "clear or substantial" likelihood that Governor Cuomo's Executive Orders have "no real or substantial relation" to protecting public health or public safety.

The first question under <u>Jacobson</u> review is whether the challenged governmental action bears a "real or substantial relation" to the danger it is designed to combat. Preliminarily, Plaintiffs do not allege any facts[7] or present any evidence that Governor

---

[7] In their amended complaint, Plaintiffs accuse Defendants of attempting "to expand their authority by unprecedented lengths" by acting "in the name of," "ostensibly in response to," and under the "flawed justification of" the COVID-19 pandemic.   (Amended Complaint, ¶¶ 3, 25, 30.)   To the extent these general accusations could be read to suggest pretext, this Court notes that no *facts* are alleged in support of this innuendo.   Moreover, Plaintiffs have presented no evidence whatsoever of pretext.   And finally, Plaintiffs have not rebutted Dr. Dufort's representation that Governor Cuomo issued his Executive Orders in consultation with medical and scientific professionals in the New York Department of Health specifically for the express purposes of eradicating COVID-19.   (Dufort Decl., ¶ 44.)

Cuomo issued his Executive Orders for any reason other than to combat the coronavirus, which Plaintiffs agree is a "calamity" and a "crisis." (Amended Complaint, ¶¶ 115, 127.) There is thus no evidence of pretext. See Cassell v. Snyders, 20 C 50153, 2020 WL 2112374, at *7 (N.D. Ill. May 3, 2020) (emphasizing that "Jacobson preserves the authority of the judiciary to strike down laws that use public health emergencies as a pretext for infringing individual liberties").

Nonetheless, Plaintiffs maintain that the Governor's Executive Orders bear no real or substantial relation to protecting the public welfare and are severe, arbitrary, unreasonable, vague, inconsistent, and contradictory. They offer no evidence in support of this position, but rather, simply argue that (1) restricting Plaintiffs' businesses has no real or substantial relationship to combatting the spread of COVID-19, and (2) prohibiting exotic dancing does not further the State's interest in combatting the spread of COVID-19. (See Memorandum of Law, Docket No. 7-1, pp. 16, 17, 18.) Neither argument has merit.

Plaintiffs first argue that the Executive Orders bear no real or substantial relation to combatting COVID-19, and that there "is no evidence to suggest that Plaintiffs would be placing the public at any greater of a risk of contracting COVID-19 than those same individuals would be at if Plaintiffs were permitted to be fully operational." (Id. p. 18.) Since the time Plaintiffs made this argument, however, Defendants have submitted Dr. Dufort's declaration, which in 116 paragraphs, fully describes the relationship between the Executive Orders and the State's fight against the coronavirus. Dr. Dufort explains the nature of COVID-19, how it is transmitted, and how it is best contained. She sets

forth the reasoning behind the Executive Orders, the need for the limitations therein, and the imminent dangers faced if they are lifted.   And she attests that the Governor issued each Executive Order in consultation with medical professionals and scientists to mitigate the "grave threat" posed by the disease.

Plaintiffs offer nothing in response.   They neither challenge Dr. Dufort's assertions nor offer any competing evidence of their own, despite alleging that the basis for the Executive Orders is "medical disinformation."   (Amended Complaint, ¶ 103.)   In fact, Plaintiffs do not address Dr. Dufort's declaration at all; it goes entirely unmentioned in their reply submission.   This is likely because, at bottom, Plaintiffs simply disagree with the government intervention taken in response to the virus.   This is apparent from their allegation that the Governor should have taken no action whatsoever, other than to "educate the People, and allow the People to act in their own best interests."   (Id. ¶¶ 82, 83.)

While reasonable minds may differ, New York is not required to respond to a public-health emergency as Plaintiffs would like.   Nor may the State's actions taken in reliance on expert scientific advice be second-guessed, for it is particularly when officials act "in areas fraught with medical and scientific uncertainties" that their latitude is "especially broad."   S. Bay United Pentecostal Church, 140 S. Ct. at 1613.   The State's chosen response is therefore entitled to deference.   See Jacobson, 197 U.S. at 30 ("It is no part of the function of a court or a jury to determine which one of two modes was likely to be most effective for the protection of the public against disease . . . That [is] for the [State] to determine in the light of all the information it had or could obtain."); Conn.

22

Citizens Def. League, Inc. v. Lamont, No. 3:20-cv-646 (JAM), 2020 WL 3055983, at *11 (D. Conn. June 8, 2020) ("[C]ourts owe great deference to the protective measures ordered by government officials in response to the COVID-19 crisis, not simply because the virus has lethal consequences but also because the virus acts in unknown ways that engender uncertainty about what scope of protective measures are warranted.").

And this is true even if the State's choices prove wrong:

> The possibility that the belief may be wrong, and that science may yet show it to be wrong, is not conclusive; for the legislature has the right to pass laws which, according to the common belief of the people, are adapted to prevent the spread of contagious diseases.   In a free country, where the government is by the people, through their chosen representatives, practical legislation admits of no other standard of action, for what the people believe is for the common welfare must be accepted as tending to promote the common welfare, whether it does in fact or not.   Any other basis would conflict with the spirit of the Constitution, and would sanction measures opposed to a Republican form of government.

Jacobson, 197 U.S. at 35; see also S. Bay United Pentecostal Church, 140 S. Ct. at 1614 (instructing that unelected judges not accountable to the people must not second-guess State action taken to combat a public-health crisis).

This also rings true for Plaintiffs' second argument—that prohibiting exotic dancing does not further the State's interest in combatting the spread of COVID-19.   Dr. Dufort explains that exotic dancing poses unique risks for transmission and is therefore prohibited (as are all forms of dancing).   (Dufort Decl., ¶¶ 67, 70.)   Exotic dancers are compensated for their close, often physical, interactions with customers, resulting in confined congregating and mingling that does not allow for social distancing.   (Id. ¶ 69.)

They earn their livings by performing on a shared stage, providing intimate "lap dances," and personally engaging customers in close proximity.   (Id. ¶¶ 69, 72-75.)   Each of these circumstances increases the risk of transmission.

Moreover, exotic dancers typically work for cash tips—a frequently touched form of payment—and often there is significant physical touching between multiple dancers and multiple customers throughout an evening.   (Id. ¶¶ 72-74.)   Exotic dance clubs also regularly hold special events, performances, and shows, which draw patrons to arrive and depart at the same time, another circumstance known to increase transmission risks. (Id. ¶¶ 69, 95, 96, 99.)

In short, the exotic-dance industry is driven by close, personal contact of the very sort known to be directly responsible for mass person-to-person spread of COVID-19. While, again, Plaintiffs may disagree with the prohibition on exotic dancing, they offer no evidence to rebut the need for it or that the State has instituted the prohibition for the express purpose of containing COVID-19.   Consequently, the unrebutted record establishes that the State's limitation on exotic dancing bears a real and substantial relation to the public-health emergency.

Based on the evidence submitted, this Court finds that Plaintiffs have failed to demonstrate a "clear or substantial" likelihood that any of the challenged Executive Orders bear "no real or substantial relation" to protecting public health and safety or are arbitrary or unreasonable.   To the contrary, the record reflects that the Orders are based on expert scientific and medical advice and are directly related to protecting the citizenry against the spread of COVID-19.   Accordingly, the Executive Orders are likely to pass

24

muster under the first <u>Jacobson</u> prong.

### d. Plaintiffs have not demonstrated a "clear or substantial" likelihood that any Executive Order is "beyond all question, a plain palpable invasion of rights."

The second question under <u>Jacobson</u> review is whether the challenged governmental action is "beyond all question, a plain palpable invasion of rights." 197 U.S. at 31. Here, Plaintiffs assert 10 substantive claims. Upon review, however, this Court finds no demonstration of a "clear or substantial" likelihood that it is "beyond all question" that enforcement of the challenged Executive Orders invades any of the rights asserted.

### i. Guarantee Clause

In their first cause of action, Plaintiffs allege that the New York State Senate and New York State Assembly violated the Guarantee Clause in Article IV, Section 4 of the federal constitution by unlawfully delegating their legislative power to the executive branch through their amendment of N.Y. Exec. L. § 29-a. (Amended Complaint, ¶¶ 116-119, 127.)

The Guarantee Clause provides that "[t]he United States shall guarantee to every State in this Union a Republican Form of Government." U.S. Const. art. IV, § 4. <u>See</u> <u>Futia v. Westchester Cnty. Bd. of Legislators</u>, 20 CV 1237 (VB), 2020 WL 4570494, at *6 (S.D.N.Y. Aug. 6, 2020). This Clause does not, however, provide the basis for a justiciable claim. <u>See</u> <u>Rucho v. Common Cause</u>, __ U.S. __, 139 S. Ct. 2484, 2506, 204 L. Ed. 2d 931 (2019) ("This Court has several times concluded, however, that the Guarantee Clause does not provide the basis for a justiciable claim."); <u>McCarthy</u>, 2020

25

WL 3286530, at *6 (finding Guarantee Clause challenge to Governor Cuomo's COVID-19 Executive Orders to be "not cognizable" and without legal basis).   Consequently, Plaintiffs do not demonstrate a clear or substantial likelihood of proving "beyond all question, a plain palpable invasion" of their rights under the Guarantee Clause. Jacobson, 197 U.S. at 31.

### ii.  Free Speech

In their third cause of action, Plaintiffs allege that the prohibition on exotic dancing, as set forth in Executive Orders and related guidance from the State Liquor Authority, violates the First Amendment's guarantee to freedom of speech.   (Amended Complaint, ¶¶ 163-177.)

The First Amendment applies to the States through the Fourteenth Amendment. See N.Y. Times Co. v. Sullivan, 376 U.S. 254, 277, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964). It prohibits the enactment of laws "abridging the freedom of speech."   U.S. Const. amend. I.   A government therefore "has no power to restrict expression because of its message, its ideas, its subject matter, or its content."   Police Dept. of Chicago v. Mosley, 408 U.S. 92, 95, 92 S. Ct. 2286, 33 L. Ed. 2d 212 (1972).   Exotic (nude) dancing constitutes expressive conduct under the First Amendment, though it is viewed as falling "only within the outer ambit of the First Amendment's protection."   See City of Erie v. Pap's A.M., 529 U.S. 277, 289, 120 S. Ct. 1382, 146 L. Ed. 2d 265 (2000).

Two forms of government restrictions on speech play prominently in the constitutional analysis: content-based and content-neutral.   They are distinguished by the government's purpose in enacting the challenged restriction.   See Ward v. Rock

Against Racism, 491 U.S. 781, 791, 109 S. Ct. 2746, 105 L. Ed. 2d 661 (1989) ("The government's purpose is the controlling consideration.")

Content-based restrictions are "those that target speech based on its communicative content."  Reed v. Town of Gilbert, Ariz., 576 U.S. 155, 163, 135 S. Ct. 2218, 192 L. Ed. 2d 236 (2015).  In other words, restrictions applicable "to particular speech *because of* the topic discussed or the idea or message expressed."  Id. (emphasis added).  These restrictions are presumptively unconstitutional and pass muster "only if the government proves that they are narrowly tailored to serve compelling state interests."  Id. (citations omitted).  Strict scrutiny therefore applies.  See Murphy v. Lamont, No. 3:20-CV-0694 (JCH), 2020 WL 4435167, at *12 (D. Conn. Aug. 3, 2020).

Content-neutral restrictions are those "that serve[ ] purposes unrelated to the content of expression . . . even if [they] ha[ve] an incidental effect on some speakers or messages but not others."  Ward, 491 U.S. at 791.  "Government regulation of expressive activity is content neutral so long as it is '*justified* without reference to the content of the regulated speech.'"  Id. (emphasis in original) (quoting Clark v. Cmty. for Creative Non-Violence, 468 U.S. 288, 293, 104 S. Ct. 3065, 82 L. Ed. 2d 221 (1984)).  These restrictions pass muster if they are "reasonable, are narrowly tailored to serve a significant governmental interest, and leave open ample alternative channels for communication of the information."  See Hobbs v. Cnty. of Westchester, 397 F.3d 133, 149 (2d Cir. 2005) (internal quotation omitted).  Intermediate scrutiny therefore applies. See Murphy, 2020 WL 4435167, at *12.

Plaintiffs maintain that the prohibition on exotic dancing is content-based and

27

subject to strict scrutiny because it bars exotic dancing in restaurants and bars while permitting other forms of live entertainment, such as live music.   (Amended Complaint, ¶¶ 75, 76, 78, 169, 170.)   Plaintiffs assert that "Defendants' restrictions have *everything* to do with the content of Plaintiff's speech" because "there is no valid or sound scientific or medical rationale for distinguishing exotic dancing from other forms of live entertainment."   (Memorandum of Law, Docket No. 19, pp. 32-33 (emphasis in original).) In Plaintiffs' view, common sense dictates that exotic dancing poses *less* of a risk for transmission than performance of live music because "[e]xotic dancers perform silently, while other live performers would be expelling air and releasing respiratory droplets during singing or other musical performances."   (See Memorandum of Law, Docket No. 19, pp. 32-33.)   Notably, Plaintiffs offer no scientific evidence or medical support for this "common sense" view.

Defendants, on the other hand, maintain that the prohibition is a temporary, content-neutral regulation.   They contend that the challenged regulations prohibit all types of entertainment—not just exotic dancing—that are likely to lead to unnecessary comingling and congregation of people in indoor spaces in an effort to promote social distancing and reduce COVID-19 transmission risks.   And they note that *all* dancing— not just exotic dancing—and other forms of live entertainment are prohibited.

This Court has little difficulty concluding that the challenged regulations are content-neutral and subject to intermediate scrutiny.   First, the regulations pertain to all dancing (e.g. theatrical dancing, line dancing, etc.) and a host of other forms of live entertainment, such as karaoke, that do not share similar expression to exotic dancing.

Second, Plaintiffs have presented no evidence that the challenged regulations are intended to restrict expressive conduct.  That is, there is no evidence that the State targeted exotic dancing for restriction *because of* the message it conveys.  Third, and relatedly, Plaintiffs offer no evidence to rebut the scientific justification and underpinnings of the Executive Orders, as explained by Dr. Dufort, which establish that they are designed solely to reduce the spread of COVID-19 without regard to the content of any expressive conduct.  And notwithstanding their "common sense" view, Plaintiffs submit no contrary evidence that, given its nature, the exotic-dancing industry presents COVID-19 transmission risks that are far greater than those associated with incidental live music performances, which are the only live music performances permitted.  (Dufort Decl., ¶¶ 64-77.)

In short, there is no evidence before this Court suggesting that the State imposed the challenged restrictions for any reason other than to combat COVID-19.  Thus, in the absence of any evidence that the State targeted exotic dancing *because of* the message it conveys, this Court finds that the challenged restrictions are content neutral.  See, e.g., McCarthy, 2020 WL 3286530, at *4 (finding New York COVID-19 Executive Orders to be content neutral and rejecting as having "no basis in reality" the plaintiffs' argument that the Executive Orders target businesses that involve an "alternate lifestyle" or "adult dancing").

Because the restrictions are content-neutral, intermediate scrutiny applies.  To survive, the restrictions must be reasonable and narrowly tailored to serve a significant governmental interest.  See Hobbs, 397 F.3d at 149.   Here, the restrictions are

reasonable due to the threat posed by COVID-19, and they are narrowly tailored to activities, including exotic dancing, that generate circumstances that pose the greatest risks for mass transmission of the virus without regard to content or message (e.g. large gatherings; close personal-to-person contact; coordinated arrival and departure times). They are also temporary, which adds to their reasonableness.   And of course, protecting the public health and welfare through eradication of the coronavirus constitutes a significant governmental interest.   See McCarthy, 2020 WL 3286530, at *4 ("I can think of few governmental interests more pressing than protecting the public from transmission of a highly-contagious and often deadly disease.").   The restrictions would thus likely survive intermediate scrutiny, which leaves Plaintiffs unable to demonstrate a clear or substantial likelihood of proving "beyond all question, a plain palpable invasion" of their rights under the First Amendment.[8]   Jacobson, 197 U.S. at 31.

### iii.  Substantive Due Process

In their fourth cause of action, Plaintiffs allege that the Governor's COVID-19 Executive Orders and related guidance violate their rights to substantive due process under the Fifth and Fourteenth Amendments.   (Amended Complaint, ¶¶ 178-195.)   At the outset, this Court notes that any claims under the Fifth Amendment fail because Plaintiffs have not sued any federal actors.   See Dusenbery v. United States, 534 U.S.

---

[8] Intermediate scrutiny also contemplates whether the challenged restrictions leave open ample alternative channels for expression.   See Hobbs, 397 F.3d at 149.   While less salient here because Plaintiffs themselves are not exotic dancers, the State correctly notes that the regulations do not restrict alternate forms of expression outside of live performances in licensed restaurants and bars, such as "print/visual media, video recording, and/or over the internet."   (See Memorandum of Law, Docket No. 15-1, p. 34.)

161, 167, 122 S. Ct. 694, 151 L. Ed. 2d 597 (2002); Delgado v. Ocasio, No. 3:19CV1116(MPS), 2019 WL 4038754, at *2 (D. Conn. Aug. 27, 2019) ("The Due Process Clause of the Fifth Amendment applies only to actions by the United States government and federal employees.") (citing Dusenbery).   Plaintiffs' substantive due process claim therefore falls solely under the Fourteenth Amendment.

The Fourteenth Amendment provides, in pertinent part, that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. XIV.   "The touchstone of due process is protection of the individual against arbitrary action of government."   Wolff v. McDonnell, 418 U.S. 539, 558, 94 S. Ct. 2963, 41 L. Ed. 2d 935 (1974).   The substantive due process clause, in particular, protects against "the exercise of power without any reasonable justification in the service of a legitimate governmental objective."   Cnty. of Sacramento v. Lewis, 523 U.S. 833, 846, 118 S. Ct. 1708, 140 L. Ed. 2d 1043 (1998) (citing Daniels v. Williams, 474 U.S. 327, 331, 106 S. Ct. 662, 88 L. Ed. 2d 662 (1986) (describing the substantive due process clause as protecting against government power arbitrarily and oppressively exercised)).

To succeed on a substantive due process claim, a plaintiff must ultimately demonstrate government action that is "arbitrary, conscience-shocking, or oppressive in a constitutional sense."   Kaluczky v. City of White Plains, 57 F.3d 202, 211 (2d Cir. 1995); Cine SK8, Inc. v. Town of Henrietta, 507 F.3d 778, 784 (2d Cir. 2007) (finding that a plaintiff must show that "defendants infringed on [his] property right in an arbitrary or irrational manner").   In this regard, only the most egregious executive action is considered "arbitrary in the constitutional sense."   Collins v. City of Harker Heights, 503

U.S. 115, 129, 112 S. Ct. 1061, 1071, 117 L. Ed. 2d 261 (1992).   Notably, government action that is simply "incorrect or ill-advised" does not fall within the protection of the substantive due process clause.   See Lowrance v. Achtyl, 20 F.3d 529, 537 (2d Cir. 1994).

Here, Plaintiffs are unlikely to demonstrate that the challenged Executive Orders are arbitrary, irrational, or conscience shocking.[9]   See Cine SK8, 507 F.3d at 784; Velez v. Levy, 401 F.3d 75, 93 (2d Cir. 2005).   In a familiar refrain, they once again argue that "there is no evidence to suggest that Plaintiffs would be placing the public at any greater of a risk of contracting COVID-19 than those same individuals would be at if Plaintiffs were permitted to be fully operational, free from the burden of the [Executive Orders]." (Memorandum of Law, Docket No. 19, p. 36.)   This wholly ignores Dr. Dufort's declaration.   As explained above, Plaintiffs have made no showing contrary to Defendants' evidence that Governor Cuomo issued his Executive Orders based on scientific and medical information in an effort to protect the public health and safety against a novel, society-threatening virus.   Nothing about this effort is arbitrary or irrational in the constitutional sense, nor does it shock the conscience.   See Page, 2020 WL 4589329, at *12 (rejecting substantive due process challenge to the COVID-19 Executive Orders).   And even if the Executive Orders are wrong or ill-advised, as Plaintiffs say they are, the substantive due process clause offers no relief on that basis.

---

9 Plaintiffs also allege and argue that "[t]he Executive Orders are similarly vague, inconsistent, and contradictory, and have only resulted in operational chaos for Plaintiffs."   (See Amended Complaint, ¶ 190; Memorandum of Law, Docket No. 7-1, p. 18.)   Plaintiffs do not, however, identify any particular Order or piece of guidance that is vague, inconsistent, or contrary.   Any such claims or arguments therefore fail.

See Lowrance, 20 F.3d at 537.   Plaintiffs therefore do not demonstrate a clear or substantial likelihood of proving "beyond all question, a plain palpable invasion" of their substantive due process rights under the Fourteenth Amendment.   Jacobson, 197 U.S. at 31.

### iv.  Procedural Due Process

In their fifth cause of action, Plaintiffs allege that the Governor's COVID-19 Executive Orders and related guidance violate their rights to procedural due process under the Fifth and Fourteenth Amendments because they were issued without notice or an opportunity to be heard.   (Amended Complaint, ¶¶ 196-200.)   Again, any Fifth Amendment claim fails because Plaintiffs sue only state officials.   See Dusenbery, 534 U.S. at 167; Delgado, 2019 WL 4038754, at *2.   Plaintiffs' procedural due process claim therefore falls solely under the Fourteenth Amendment.

The Fourteenth Amendment due process clause incorporates a protection against the deprivation of a protected interest in life, liberty, or property without procedural fairness.   See Fuentes v. Shevin, 407 U.S. 67, 82, 92 S. Ct. 1983, 32 L. Ed. 2d 556 (1972).   "The fundamental requirement of the Due Process Clause is that an individual be given the opportunity to be heard at 'a meaningful time and in a meaningful manner.'" Patterson v. City of Utica, 370 F. 3d 322, 336 (2d Cir. 2004) (citing Goldberg v. Kelly, 397 U.S. 254, 267, 90 S. Ct. 1011, 25 L. Ed. 2d 287 (1970)); Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 542, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985) (describing the procedural due process clause as requiring that "a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case")

(citations omitted).

But this protection applies only when official action is "designed to adjudicate disputed facts in particular cases."   United States v. Fla. E. Coast Ry. Co., 410 U.S. 224, 245, 93 S. Ct. 810, 35 L. Ed. 2d 223 (1973).   When official action is legislative in nature, it "is not subject to the notice and hearing requirements of the due process clause." Interport Pilots Agency, Inc. v. Sammis, 14 F.3d 133, 142 (2d Cir. 1994) (citing RR Vill. Ass'n v. Denver Sewer Corp., 826 F.2d 1197, 1204-05 (2d Cir. 1987)).

Here, the challenged Executive Orders are legislative in nature—they apply generally and do not adjudicate facts in individual cases.   Moreover, they could at any time be vacated by the New York legislature.   See N.Y. Exec. L. § 29-a (4) ("The legislature may terminate by concurrent resolution executive orders issued under this section at any time.")   Plaintiffs have thus received all of the process due through the legislative determinations underlying § 29-a.   See Logan v. Zimmerman Brush Co., 455 U.S. 422, 433, 102 S. Ct. 1148, 71 L. Ed. 2d 265 (1982).   Individual procedural due process protections therefore do not apply.   See Murphy, 2020 WL 4425167, at *11 (finding Connecticut governor's COVID-19 Executive Orders to be legislative acts not subject to the procedural protections in the due process clause).   Plaintiffs thus do not demonstrate a clear or substantial likelihood of proving "beyond all question, a plain palpable invasion" of their procedural due process rights under the Fourteenth Amendment.[10]   Jacobson, 197 U.S. at 31.

---

10 To the extent the Executive Orders could be viewed as adjudicatory acts requiring the protections guaranteed by the procedural due process clause, Plaintiffs' claim would still likely fail because the State provides an adequate post-deprivation remedy in the form of an Article 78 proceeding, which Plaintiffs

### v.  Takings Clause

In their sixth cause of action, Plaintiffs allege that the effect of the Governor's COVID-19 Executive Orders is to substantially diminish the economically beneficial and profitable use of their properties, thus requiring just compensation under the Fifth Amendment Takings Clause.   (Amended Complaint, ¶¶ 201-215.)

The Takings Clause provides that "nor shall private property be taken for public use, without just compensation."   U.S. Const. amend. V.   It applies to the states through the Fourteenth Amendment.   See Kelo v. City of New London, Conn., 545 U.S. 469, 472 n. 1, 125 S. Ct. 2655, 162 L. Ed. 2d 439 (2005) (citing Chi., Burlington, & Quincy R.R. Co. v. Chicago, 166 U.S. 226, 17 S. Ct. 581, 41 L. Ed. 979 (1897)).

The Takings Clause imposes two conditions on a state's authority to take private property: "the taking must be for a public use and just compensation must be paid to the owner."   Brown v. Legal Found. of Wash., 538 U.S. 216, 231, 123 S. Ct. 1406, 1417, 155 L. Ed. 2d 376 (2003) (internal quotations omitted); see First Eng. Evangelical Lutheran Church of Glendale v. Cnty. of Los Angeles, 482 U.S. 304, 314, 107 S. Ct. 2378, 96 L. Ed. 2d 250 (1987) (noting that the Takings Clause "does not prohibit the taking of private property, but instead places a condition on the exercise of that power").   The purpose of the Takings Clause is to prevent the government "from forcing some people alone to bear

---

concede they could have pursued.   See Grillo v. N.Y.C. Transit Auth., 291 F.3d 231, 234 (2d Cir. 2002) (per curiam) ("This court has 'held on numerous occasions' that where, as here, a party sues the state and its officials and employees for the arbitrary and random deprivation of a property or liberty interest, 'an Article 78 proceedings is a perfectly adequate post[-]deprivation remedy.'") (quoting Hellenic Am. Neighborhood Action Comm. v. City of New York, 101 F.3d 877, 880-81 (2d Cir. 1996)); see also Memorandum of Law, Docket No. 19, p. 41.

public burdens which, in all fairness and justice, should be borne by the public as a whole.'" Armstrong v. United States, 364 U.S. 40, 49, 80 S. Ct. 1563, 4 L. Ed. 2d 1554 (1960).

Generally speaking, there are two types of takings.   The quintessential taking is one where "a direct government appropriation or physical invasion of private property" occurs.   Lingle v. Chevron U.S.A., Inc., 544 U.S. 528, 537, 125 S. Ct. 2074, 161 L .Ed. 2d 876 (2005); see Palazzolo v. Rhode Island, 533 U.S. 606, 617, 121 S. Ct. 2448, 150 L. Ed. 2d 592 (2001) ("The clearest sort of taking occurs when the government encroaches upon or occupies private land for its own proposed use."); see also Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency, 535 U.S. 302, 321-323, 122 S. Ct. 1465, 152 L. Ed. 2d 517 (2002) (describing the Supreme Court's jurisprudence involving physical takings to be "as old as the Republic").

The other type of taking is the one first recognized in Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 43 S. Ct. 158, 67 L. Ed. 322 (1922), where "the Court recognized that there will be instances when government actions do not encroach upon or occupy the property yet still affect and limit its use to such an extent that a taking occurs." Palazzolo, 533 U.S. at 617 (discussing Pa. Coal).   This type of taking is commonly referred to as a "regulatory taking."   Plaintiffs assert a regulatory taking here.

"Regulatory takings are based on the principle that 'while property may be regulated to a certain extent, if a regulation goes too far it will be recognized as a taking.'" Ganci v. N.Y.C. Transit Auth., 420 F. Supp. 2d 190, 195 (S.D.N.Y. 2005) (citing Pa. Coal, 260 U.S. at 415).   There are again two types: categorical and non-categorical.   A

36

categorical regulatory taking involves "the extraordinary circumstance when *no* productive or economically beneficial use of [property] is permitted."   See Tahoe-Sierra, 535 U.S. at 330 (quoting Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1017, 112 S. Ct. 2886, 120 L. Ed. 2d 798 (1992)) (emphasis in original).   All other regulatory takings are non-categorical: those involving "[a]nything less than a complete elimination of value, or a total loss."   Penn Cent. Transp. Co. v. City of N.Y., 438 U.S. 104, 98 S. Ct. 2646, 57 L. Ed. 2d 631 (1978).

Analyzing non-categorical takings under Penn Central "requires an intensive *ad hoc* inquiry into the circumstances of each particular case."   Buffalo Tchrs. Fed'n v. Tobe, 464 F.3d 362, 375 (2d Cir. 2006).   Three factors are weighed: "(1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action."   Connolly v. Pension Benefit Guar. Corp., 475 U.S. 211, 224-25, 106 S. Ct. 1018, 89 L. Ed. 2d 166 (1986).

Plaintiffs allege that compliance with the Executive Orders has forced them to "sacrifice all, or nearly all, beneficial use of their property in the name of public health" and has "rendered useless Plaintiffs' property from its economic benefit during the COVID-19 pandemic."   (Amended Complaint, ¶¶ 206, 209.)   But the majority of Plaintiffs concede that they are able to make *some* use of their property: Karate Ken's has re-opened to martial arts classes (see Affidavit of Kenneth Meier, Docket No. 19-1, ¶¶ 5, 6); The Cowboy of Chippewa, Four Aces Bar & Grill, and Five Star Lanes are open and operating (see Affidavit of Alfred Castricone, Docket No. 19-2, ¶¶ 6, 8, 10, 11, 15); and

Pharaohs has re-opened (see Affidavit of Peter Gerace, Docket No. 19-3, ¶¶ 6, 8). Soonertunes Productions and The Body Shop have been closed since March 2020, but neither is *required* to be closed under the Executive Orders.   (See Affidavit of Richard Rice, Docket No. 19-4; Amended Complaint, ¶ 70.)   Plaintiffs are therefore unlikely to succeed on any categorical claim, since they are not precluded from *all* economically beneficial uses of their property.   See Tahoe-Sierra, 535 U.S. at 330 (providing that a plaintiff must show *no* productive or economically beneficial use of his or her property to sustain a categorical regulatory takings claim).

Plaintiffs are also unlikely to succeed on any non-categorical regulatory takings claim.   First, the Executive Orders are temporary and do not preclude all economic use of Plaintiffs' property.   See Buffalo Tchrs. Fed'n, 464 F.3d at 375 (finding that temporary and partial nature of wage freeze weighed against finding a taking); Kabrovski v. City of Rochester, N.Y., 149 F. Supp. 3d 413, 425 (W.D.N.Y. 2015) ("[I]t is well settled that a 'taking' does not occur merely because a property owner is prevented from making the most financially beneficial use of a property.") (citation omitted).   Second, although Plaintiffs' investment-backed expectations in their respective businesses are surely disrupted, the Executive Orders are "a negative restriction rather than an affirmative exploitation by the state," which also weighs against a taking.   See Buffalo Tchrs. Fed'n, 464 F.3d at 375.

Third, and perhaps most importantly, the State "does not physically invade or permanently appropriate any of [Plaintiffs'] assets for its own use."   Connolly, 475 U.S. at 225.   Rather, the character of the government action here is a temporary exercise of

the police power to protect the health and safety of the community, which weighs against a taking.   See id. (noting that "interference with the property rights of an employer aris[ing] from a public program that adjusts the benefits and burdens of economic life to promote the common good" does not constitute a compensable taking under Supreme Court precedents); see also Lebanon Valley Auto Racing Corp. v. Cuomo, 1:20-CV-804 (LEK/TWD), 2020 WL 4596921, at *8 (N.D.N.Y. Aug. 11, 2020) (finding that the character of COVID-19 Executive Orders strongly favors the State defendants).

The Penn Central analysis therefore weighs against finding a non-categorical regulatory taking.   Plaintiffs thus do not demonstrate a clear or substantial likelihood of proving "beyond all question, a plain palpable invasion" of their rights under the Takings Clause.   Jacobson, 197 U.S. at 31.

### vi.  Equal Protection

In their seventh cause of action (Amended Complaint, ¶¶ 216-227) and part of their third (id. ¶¶ 166, 168, 175, 177), Plaintiffs allege that the Governor's COVID-19 Executive Orders violate their equal protection rights under the Fourteenth Amendment.

The Equal Protection Clause of the Fourteenth Amendment commands that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.   It is "essentially a direction that all persons similarly situated be treated alike."   City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439, 105 S. Ct. 3249, 3254, 87 L. Ed. 2d 313 (1985); see also Sound Aircraft Servs., Inc. v. Town of E. Hampton, 192 F.3d 329, 335 (2d Cir.1999) ("[a]t its core, equal protection prohibits the government from treating similarly situated persons differently").

The Equal Protection Clause "bars the government from selective adverse treatment of individuals compared with other similarly situated individuals if 'such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'"   Bizzarro v. Miranda, 394 F.3d 82, 86 (2d Cir. 2005) (quoting LeClair v. Saunders, 627 F.2d 606, 609-10 (2d Cir. 1980)).   Where, as here, a plaintiff does not claim membership in a protected class, he or she may pursue a "selective-enforcement" or "class-of-one" claim.   See Rankel v. Town of Somers, 999 F. Supp. 2d 527, 544 (S.D.N.Y. 2014).   Under either theory, the plaintiff must demonstrate that he or she was treated differently from other similarly situated individuals.

Plaintiffs generically allege that the State has arbitrarily and unreasonably treated them differently from unidentified "identically situated businesses throughout the State of New York." (Amended Complaint, ¶¶ 220, 221, 225.)   Plaintiffs Pharaohs and The Body Shop maintain that they are similarly situated to establishments that are permitted to provide live entertainment, such as "live bands, music, and singers."   (Id. ¶¶ 168, 224.)

These allegations are insufficient to support an equal protection claim.   First, a comparison to unidentified "identically situated businesses" is far too vague and ill defined.[11]   See Clubside, Inc. v. Valentin, 468 F.3d 144, 159 (2d Cir. 2006) ("plaintiffs

---

[11] Also too vague and ill-defined is Plaintiffs' attempt to liken bars and restaurants to any business of any type permitted to operate anywhere in New York.   They argue that "certain restrictions have been imposed upon restaurants and bars . . . on occupancy, capacity, and the like . . . However, not all businesses are facing the same restrictions, as many are permitted to allow the public to enter the respective facilities, engage in business, and leave, all without having to be concerned for the building's maximum occupancy levels." (Memorandum of Law, Docket No. 19, p. 44.)   Again, no *similarly situated* business is identified, and a generic comparison to any business of any type whatsoever is patently insufficient to support an equal protection claim.

must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves").   Second, Plaintiffs identify no similar businesses that the State has treated more favorably.   For example, they do not name other martial arts schools permitted to open at full capacity, other gentlemen's clubs permitted to offer live exotic dancing, or other bowling alleys permitted to operate without restrictions.   The comparators Plaintiffs cite—live bands, music, and singers—are facially dissimilar and dissimilar in the context of COVID-19 transmission for all of the unrebutted reasons set forth in Dr. Dufort's declaration.   (Dufort Decl., ¶¶ 64-102.)   In the absence of similarly situated comparators, Plaintiffs likely cannot sustain their equal protection claims.

For these reasons, Plaintiffs do not demonstrate a clear or substantial likelihood of proving "beyond all question, a plain palpable invasion" of their equal protection rights under the Fourteenth Amendment.   Jacobson, 197 U.S. at 31.

### vii.   Ninth and Tenth Amendments

In their eighth cause of action, Plaintiffs allege that the Governor's COVID-19 Executive Orders violate the Ninth and Tenth Amendments.   (Amended Complaint, ¶¶ 228-234.)   Neither amendment provides grounds for relief.

The Ninth Amendment provides that "[t]he enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people." U.S. Const. amend. IX.   This is a rule of construction: "[t]he full scope of the specific guarantees [in the Constitution] is not limited by the text, but embraces their purpose." United States v. Bifield, 702 F.2d 342, 349 (2d Cir. 1983).   It is "not an independent source of individual rights."   Jenkins v. Comm'r of Internal Revenue Serv., 483 F. 3d 90,

92 (2d Cir. 2007); see also Posr v. City of New York, No. 10 CIV 2552 (RPP), 2013 WL

2419142, at *12 (S.D.N.Y. June 4, 2013) (holding that the Ninth Amendment "cannot

serve as the basis for a § 1983 claim").   Plaintiffs therefore do not demonstrate a clear

or substantial likelihood of proving "beyond all question, a plain palpable invasion" of

rights under the Ninth Amendment.   Jacobson, 197 U.S. at 31.

The Tenth Amendment is similarly of no avail.   It provides that "[t]he powers not

delegated to the United States by the Constitution, nor prohibited by it to the States, are

reserved to the States respectively, or to the people."   U.S. Const. amend. X.   It too is

largely akin to a rule of construction: "This amendment is mere affirmation of what, upon

any just reasoning, is a necessary rule of interpreting the constitution.   Being an

instrument of limited and enumerated powers, it follows irresistibly, that what is not

conferred, is withheld, and belongs to the state authorities."   New York v. United States,

505 U.S. 144, 156, 112 S. Ct. 2408, 120 L. Ed. 2d 120 (1992) (quoting 3 J. Story,

Commentaries on the Constitution of the United States 752 (1833)).   The Tenth

Amendment thus regulates powers between the federal government and the States.

See id. ("[T]he Tenth Amendment confirms that the power of the Federal Government is

subject to limits that may, in a given instance, reserve power to the States.").

Nonetheless, the Tenth Amendment may be enforceable in the individual context,

for "as long as a litigant 'is a party to an otherwise justiciable case or controversy,' she

may 'object that her injury results from disregard of the federal structure of our

Government.'"   Vullo v. Off. of Comptroller of Currency, 378 F. Supp. 3d 271, 291

(S.D.N.Y. 2019) (citing Bond v. United States, 564 U.S. 211, 226, 131 S. Ct. 2355, 180

42

L. Ed. 2d 269 (2011)).

But that is not Plaintiffs' claim.   They sue only state actors and attempt to assert a stand-alone claim.   See Warren v. United States, 859 F. Supp. 2d 522, 543 (W.D.N.Y. 2012) (noting that Tenth Amendment protections run "as against the federal government"); see also Rivera v. FBI, 5:16-CV-997 (NAM/TWD), 2016 WL 6081435, at *3 n. 4 (N.D.N.Y. Sept. 13, 2016) ("There is no private right of action under the Tenth Amendment.").   Consequently Plaintiffs do not demonstrate a clear or substantial likelihood of proving "beyond all question, a plain palpable invasion" of rights under the Tenth Amendment.   Jacobson, 197 U.S. at 31.

### viii.  Compact Clause

In their tenth cause of action, Plaintiffs allege that Governor Cuomo entered a compact with other regional governors to prevent the spread of COVID-19, in violation of the Compact Clause.   (Amended Complaint, ¶¶ 245-249.)

The Compact Clause provides that "[n]o State shall, without the Consent of Congress, . . . enter into any Agreement or Compact with another State."   U.S. Const. Art. 1, § 10, cl. 3.   The Framers included this clause "to ensure that Congress would maintain ultimate supervisory power over cooperative state action that might otherwise interfere with the full and free exercise of federal authority."   Cuyler v. Adams, 449 U.S. 433, 440, 101 S. Ct. 703, 66 L. Ed. 2d 641 (1981).

But not all interstate agreements fall under the Compact Clause.   Where an interstate agreement falls outside the clause—such as when it is not "directed to the formation of any combination tending to the increase of political power in the States, which

43

may encroach upon or interfere with the just supremacy of the United States"—congressional consent is not required and the agreement is not subject to invalidation for lack of congressional consent.   Id. (citing U.S. Steel Corp. v. Multistate Tax Comm'n, 434 U.S. 452, 468, 98 S. Ct. 799, 54 L. Ed. 2d 682 (1978)).

Here, Plaintiffs allege that Governor Cuomo, without congressional approval, entered into a multistate compact that unlawfully permits the governors of other states to dictate the COVID-19 mitigation efforts and economic reopening of New York. (Amended Complaint, ¶ 247.)   By doing so, they contend that Governor Cuomo "permitted other governors to control, domineer and direct the public health and safety responsibilities which belong to Defendant Cuomo alone."   (Amended Complaint, ¶ 248.) In short, Plaintiffs claim that Governor Cuomo is improperly allowing other governors to dictate New York's response to the pandemic.

These allegations do not support a Compact Clause claim.   Nowhere do Plaintiffs allege or argue that the agreement among the governors (which Plaintiffs do not specifically identify) threatens federal supremacy or tends to unduly increase the States' political power in relation to the federal government.   That is, even accepting the existence of an agreement as Plaintiffs have described it, nothing in the amended complaint or record suggests that the agreement falls within the Compact Clause.   And it must further be noted that cooperation among states of the sort alleged here has been recognized as not requiring congressional approval:

> There are many matters upon which different states may agree that can in no respect concern the United States. . . . If the bordering line of two states should cross some malarious

44

> and disease-producing district, there could be no possible reason, on any conceivable public grounds, to obtain the consent of congress for the bordering states to agree to unite in draining the district, and thus removing the cause of disease.   So, in case of threatened invasion of cholera, plague, or other causes of sickness and death, it would be the height of absurdity to hold that the threatened states could not unite in providing means to prevent and repel the invasion of the pestilence without obtaining the consent of congress, which might not be at the time in session.

Virginia v. Tennessee, 148 U.S. 503, 518, 13 S. Ct. 728, 37 L. Ed. 537 (1893).

Accordingly, Plaintiffs have not demonstrated a clear or substantial likelihood of proving "beyond all question, a plain palpable invasion" of rights under the Compact Clause.   Jacobson, 197 U.S. at 31.

### ix.  State-Law Claims

Plaintiffs' amended complaint also contains three state-law causes of action.   In their first cause of action, Plaintiffs allege that N.Y. Exec. L. § 29-a is unconstitutional under the New York constitution.   (Amended Complaint, ¶¶ 117, 118, 121-144.)   In their second cause of action, Plaintiffs allege that Governor Cuomo's Executive Orders and the enforcement of them violates § 29-a.   (Id. ¶¶ 145-162.)   And in their ninth cause of action, Plaintiffs allege that Defendants have violated the "Take Care Clause" of the New York constitution, which provides that the governor "shall expedite all such measures as may be resolved upon by the legislature, and shall take care that the laws are faithfully executed."   N.Y. Const. art. IV, § 3.

Given that the federal claims are each unlikely to succeed under the Jacobson framework, this Court would decline to exercise supplemental jurisdiction over Plaintiffs'

state-law claims and therefore declines to address them now.  See 28 U.S.C. § 1367 (c)(3).  The Supreme Court has instructed that courts should ordinarily decline to exercise supplemental jurisdiction in the absence of federal claims.  See Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n. 7, 108 S. Ct. 614, 98 L. Ed. 2d 720 (1988) (noting that in the usual case where all federal claims are eliminated, the relevant factors informing the decision of whether to exercise supplemental jurisdiction will "point towards declining to exercise jurisdiction over the remaining state-law claims"); United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726, 86 S. Ct. 1130, 16 L. Ed. 2d 218 (1966) ("Certainly, if the federal claims are dismissed before trial, . . . the state claims should be dismissed as well.").

The Second Circuit shares this view: where "federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims."  Valencia ex rel. Franco v. Lee, 316 F.3d 299, 305 (2d Cir. 2003); see also Marcus v. AT&T Corp., 138 F.3d 46, 57 (2d Cir. 1998) ("In general, where the federal claims are dismissed before trial the state claims should be dismissed as well.").

Plaintiffs' state-law claims require interpretation of state law alone, and are thus more appropriately determined in state court in the interests of comity and efficiency, particularly because they involve important state constitutional questions.  Accordingly, this Court would decline to exercise supplemental jurisdiction over Plaintiffs' state law claims, and, in the absence of a likelihood of success on any federal claims, declines to

entertain the state-law claims in the context of Plaintiffs' request for injunctive relief.

* * * * *

Accordingly, because Plaintiffs do not demonstrate a clear or substantial likelihood of proving that any of the challenged Executive Orders or related guidance are "beyond all question, a plain palpable invasion" of any rights asserted in the amended complaint, this Court finds that the Executive Orders are likely to pass muster under the second Jacobson prong.

### 2. Plaintiffs do not make a strong showing of irreparable harm or establish that the balance of equities and public interest weigh in their favor.

While this Court need not consider the remaining preliminary injunction factors, see McCarthy, 2020 WL 3286530, at *3, it does so briefly to highlight that they too counsel against injunctive relief.

First, Plaintiffs have not made the required "strong showing" of irreparable harm. Citing Jolly v. Coughlin, they first argue that a presumption of irreparable harm flows from the mere assertion of a constitutional violation.  76 F.3d 468, 482 (2d Cir. 1996).  But "the favorable presumption of irreparable harm arises only *after* a plaintiff has shown a likelihood of success on the merits of the constitutional claim," which Plaintiffs have not done.  Page, 2020 WL 4589329, at *6 (citing Jolly, 76 F.3d at 482 ("[W]e agree with the district court that the plaintiff has shown a substantial likelihood of success on his Eighth Amendment claim.  The district court *therefore* properly relied on the presumption of irreparable injury that flows from a violation of constitutional rights.") (emphasis added); see also Turley v. Giuliani, 86 F Supp. 2d 291, 295 (S.D.N.Y. 2000) (noting that when

irreparable harm is premised on a constitutional violation, "the two prongs of the preliminary injunction threshold merge into one . . . to show irreparable injury, plaintiff must show a likelihood of success on the merits").

Moreover, while the economic impact of the challenged Executive Orders is no doubt significant, the Orders are temporary; Plaintiffs are permitted to continue business operations within the confines of the Executive Orders; and no documentary evidence has been submitted to support Plaintiffs' claims of near insolvency.   See Lebanon Valley, 2020 WL 4596921, at *8.   The necessary "strong showing" of irreparable harm is therefore absent.

Second, Plaintiffs have not demonstrated that the balance of equities and public interest weigh in their favor.   Weakening the State's response to a public-health crisis by enjoining it from enforcing measures employed specifically to stop the spread of COVID-19 is not in the public interest.   See Luke's Catering, 2020 WL 5425008, at *13.   Nor does the balance of equities in permitting Plaintiffs to implement precautions as they see fit outweigh the general welfare of the state and the pressing need to eradicate this virus. The balance of equities and the public interest therefore favor Defendants.   See id.; see also Page, 2020 WL 4589329, at *10 (finding that balance of equities and public interest weighed against enjoining an Executive Order requiring self-quarantine because "the injunctive relief sought . . . would also upset a major component of the State's current public health response to COVID-19"); Ass'n of Jewish Camp Operators, 2020 WL 3766496, at *21 (denying request to require the opening of overnight summer camps as not in the public interest "[g]iven the unprecedented nature of the COVID-19 pandemic,

48

the deadly nature of the virus itself, the lack of a vaccine . . ., and lack of scientific agreement about its transmission"); Geller v. Cuomo, 20 Civ. 4653 (ER), 2020 WL 4463207, at *11 (S.D.N.Y. Aug. 3, 2020) (concluding that Executive Order 202.45 "promotes a substantial government interest . . ., namely, to mitigate the harm and spread of the pandemic, which would be 'achieved less effectively' absent the gathering restrictions") (citation omitted).

* * * * *

For the reasons set forth above, Plaintiffs have not demonstrated a clear or substantial likelihood of success on any of their claims, nor have they made the required strong showing of irreparable harm or established that the balance of equities and public interest weigh in their favor.  Plaintiffs' motion for a temporary restraining order and preliminary injunction is therefore denied.

## IV. CROSS-MOTIONS TO DISMISS

Defendants have moved to dismiss Plaintiffs' amended complaint on various grounds.  Without reaching the merits of those individual arguments, this Court finds, as it did in Luke's Catering, that Jacobson stands as a formidable obstacle to each of the claims asserted in the amended complaint.  See Luke's Catering, 2020 WL 5425008, at *14.  Since the amended complaint contains no claims properly pleaded under the Jacobson framework, it is subject to dismissal.  See, e.g., id.; Page, 2020 WL 4589329, at *12 (dismissing claims, in part, for "fail[ure] to state a plausible claim for relief under the deferential framework of Jacobson" and describing Jacobson as a "complete roadblock" to the plaintiff's claims).

49

But because this Court cannot determine as a matter of law on the record before it that none of Plaintiffs' claims would survive if re-pleaded under <u>Jacobson</u>, it will afford Plaintiffs the opportunity to file a second amended complaint.   <u>See</u> Fed. R. Civ. P. 15 (a)(2) (requiring that leave to amend be freely given when justice so requires).   If Plaintiffs do not file a second amended complaint within 14 days of the entry date of this decision, this case will be closed without further order of this Court.

## V. CONCLUSION

While it is no secret that reasonable minds can and do differ over what measures might be most effective and desirable in the fight against COVID-19, there is little room for debate in this forum.   <u>Jacobson</u> instructs that it is "no part of the function of a court" to determine which measures are "likely to be the most effective for the protection of the public against disease."   <u>Jacobson</u>, 197 U.S. at 30.   Rather, it is for the State to determine and implement, with wide latitude, such emergency measures as it deems reasonably necessary to protect the public welfare.   This Court would usurp the State's police power and the function of another branch of government if it were to second-guess or substitute its judgment for that of the State's.   Constrained by the applicable standard of review, this Court finds that Plaintiffs' motion for a temporary restraining order and preliminary injunction must therefore be denied.   Defendants' cross-motion to dismiss is granted, with leave afforded to Plaintiffs to file a second amended complaint.

## VI.   ORDERS

IT HEREBY IS ORDERED, that Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction (Docket No. 7) is DENIED.

FURTHER, that Defendants' Cross-Motion to Dismiss (Docket No. 15) is GRANTED.

FURTHER, that Plaintiffs are granted leave to file a second amended complaint within 14 days of the entry date of this decision.

FURTHER, that if Plaintiffs do not file a second amended complaint within 14 days of the entry date of this decision, the Clerk of Court is directed to CLOSE this case without further order of this Court.

SO ORDERED.

Dated:        October 21, 2020
              Buffalo, New York

                                        s/William M. Skretny
                                       WILLIAM M. SKRETNY
                                     United States District Judge